# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**RICHARD KAMMEN**
**MARY SPEARS**
Kammen Maryan & Moudy
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

FILED

Dec 21 2012, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

STEVEN E. MALLOCH,          )
                            )
    Appellant-Defendant,    )
                            )
      vs.                 )          No. 17A03-1201-CR-37
                            )
STATE OF INDIANA,           )
                            )
    Appellee-Plaintff.      )

APPEAL FROM THE DEKALB SUPERIOR COURT
The Honorable Monte L. Brown, Judge
Cause No. 17D02-1001-FA-2

**December 21, 2012**

**OPINION - FOR PUBLICATION**

**SHARPNACK, Senior Judge**

STATEMENT OF THE CASE

Steven E. Malloch appeals his conviction for Class A felony child molesting, Ind. Code § 35-42-4-3(a)(1) (1998), for an incident involving his stepdaughter.  We affirm.

ISSUES

Malloch raises five issues, which we reorder and restate as:

I.      Whether the trial court abused its discretion by denying Malloch's motion for a continuance made three days before trial.

II.     Whether the trial court erred by admitting Malloch's statements in two videorecorded interviews, in which he ultimately confessed to the crime.

III.    Whether it was fundamental error for the trial court to allow without admonishment the interrogating detective's repeated assertions during the videorecorded interviews that Malloch was guilty.

IV.     Whether the trial court erred by admitting Malloch's apology letter to his stepdaughter.

V.      Whether the State committed prosecutorial misconduct amounting to fundamental error.

FACTS AND PROCEDURAL HISTORY

In 1998, Malloch began living with Anita Malloch and her four-year-old daughter C.P., who was born in 1993.  Malloch and Anita married in 1999 and subsequently had three sons.  C.P. had regular parenting time with her biological father but primarily lived in the Malloch home.  She called Malloch "Dad."

In 2003 and 2004, when C.P. was in fourth grade, the family lived in Auburn, Indiana, next to a cemetery.  C.P. was sometimes scared at night because of the cemetery and would ask Anita or Malloch to lie down with her.  On one occasion when Malloch lay with C.P., she awoke with his hand underneath her shirt on her breast.  Malloch

2

appeared to be asleep. C.P. removed his hand, rolled over, and went back to sleep. She never talked with him about the incident.

In June 2004, the family moved to a ten-acre property in Garrett, Indiana. They lived in a small apartment in a barn until March 2005, when construction of their house was completed. At some point while they lived in the barn, C.P. watched a werewolf movie and was scared to go to bed. She first asked Anita to lie down with her, but when Anita told her she was busy, she asked Malloch. C.P. fell asleep in her bed with Malloch beside her. When she woke up, Malloch's hand was in her underwear and his finger was in her vagina. Again, Malloch appeared to be asleep. C.P. pulled his hand out of her pants, crawled over him, and slept with her then-six-year-old brother in his bed. The next morning, Malloch asked C.P. why she ended up in her brother's bed. C.P. answered, "[B]ecause." Tr. p. 376. She never asked him to lie down with her again.

At some point while the family still lived in the barn, Anita watched an episode of "Dr. Phil" about child molesting and asked C.P. whether she had ever been touched. C.P. told Anita what had happened with Malloch. When Anita confronted Malloch, he claimed that he did not know what Anita was talking about and that if anything had happened, it had happened while he was asleep.

Roughly five years later, Anita told her counselor about the two incidents. On January 22, 2010, Anita's counselor reported the matter to Jennifer Hupfer, a caseworker for the Department of Child Services, who in turn notified Detective Donald Lauer of the DeKalb County Sheriff's Department. Later that day, Hupfer and Detective Lauer went to the Malloch home and informed Malloch of the allegations. Malloch said he was

3

asleep and woke up to find his finger in C.P.'s vagina. He agreed to go to the Sheriff's Department for a formal interview and drove himself there.

Detective Lauer conducted two interviews with Malloch in his office. Before the first interview, Detective Lauer read Malloch his *Miranda* rights, and Malloch indicated that he understood them, had no questions about them, and wished to talk. During this interview, Detective Lauer employed the two-part Reid Technique, which he later described at trial as the "gold standard of . . . police interviewing." *Id.* at 443. The first phase of the Reid Technique consists of nonaccusatory questioning. The interview then shifts to the second phase, where the questioner does most of the talking and claims that the investigation clearly shows that the suspect committed the crime. A questioner using the Reid Technique introduces "different minimizing themes," in essence excuses or justifications, to make it easier and more comfortable for the suspect to admit to the crime. *Id.* at 445.

In the first phase here, Detective Lauer explained that his job was to separate the "small percentage of people . . . who prey on people" from "average good guys, like you and me, who make a mistake . . . and . . . accept responsibility." Defendant's Ex. A, p. 8.[1] Malloch told Detective Lauer he was in bed with C.P. because she was scared, he woke to find his hand in her pants and his finger in her vagina, he pulled his hand out, and C.P. kicked him off the bed. He also admitted to the earlier incident, when his hand

---

[1] Defendant's Exhibit A, the transcript of the interviews, was not admitted into evidence at trial. However, it was admitted at the suppression hearing. For ease of reference, we cite pages of Defendant's Exhibit A throughout this opinion instead of timestamps on the video recordings of the interviews, which were admitted and viewed by the jury.

4

was underneath C.P.'s shirt on her breast, but claimed that he had woken up that way and thought she was asleep when he got up and went to his room.

Detective Lauer said he had to determine whether Malloch was asleep or not and whether he was a "bad guy" or "not so bad guy." *Id.* at 17. Malloch claimed he was being honest. Detective Lauer then asked if he had ever had sexual thoughts about C.P. Malloch responded, "No. . . . I mean, she's a pretty girl, and, you know--and she walks around in--in her underwear at times, and stuff like that, but I--I'm always like, 'Put your clothes'--you know, 'Get clothes on,' I--you know, that 'You don't need to be doing that.'" *Id.* at 18. Detective Lauer asked Malloch about a polygraph test, and Malloch responded that he would be willing to take the test. Malloch said he felt responsible for the incidents because he was the adult and being asleep was not an excuse.

Detective Lauer then said C.P. had told him that at some point she was "sitting downstairs like in her underwear and bra and stuff, kind of inappropriate, I think, I mean she shouldn't of [sic] been doing that, I guess, I mean that's on--that's on her, I mean, she should . . . know better than to . . . be doing that." *Id.* at 25-26. Malloch later offered, "I would suppress the thought. You know, if--see her standing at the sink, or whatever, kind of a thing, you know, I--I would throw it out of my mind, I would say 'That's not right,' you know." *Id.* at 26. Malloch explained how he would walk away from the situation and offered this vignette: "[T]wo months ago, or something, walking upstairs, to go to bed, and [C.P.]'s door is cracked, and she was standing there taking off her shirt, and I mean, I saw her breasts, but then I went to my room." *Id.* at 27.

5

Detective Lauer asked whether, assuming Malloch was awake, it was "kind of just a spur of the moment type thing, or--some guys actually will sit and plot out a way[.] . . . I call those people . . . the one percenters, those luckily are the--the people that are few and far between." *Id.* at 29-30. Malloch claimed it would have been spur of the moment. Detective Lauer then left the room. This portion of the interview was about thirty minutes.

When Detective Lauer returned, he sat closer to Malloch and said, "[M]y investigation clearly shows that you touched her, and you were awake when you did that, this was a conscious thing that you did." *Id.* at 31. Malloch said that he woke up to it, but Detective Lauer said:

> No, you were awake when you did it, . . . that was a conscious thing, . . . you were awake when you did that. Now, what I need to find out is certain other things like, was this a spur of the moment thing, you know, and that's what we need to talk about, because, like I said, I've got to figure out what kind of guy is Steve.

*Id.* Detective Lauer offered many minimizing themes, including that it was good that the incidents occurred when C.P. was asleep because maybe she would not remember what happened, that C.P. was a pretty girl and was "walking around half naked," that Malloch was a guy and was "gonna have those thoughts," that maybe there were "tough things going on" in Malloch's life at the time, and that maybe his wife "turned off the faucet and there wasn't any, you know, sexual activity or something." *Id.* at 33-34. Malloch admitted that he was awake when he put his hand on C.P.'s breast:

> DETECTIVE: So, what I want to know, I guess, is--is--I mean, I can just keep babbling here, but I need to know what's going on--what was going

6

on in your head when that happened.,  And, you were awake, don't tell me you--because, you--you--

MR. MALLOCH: I--I--the hand in the shirt, yes.

*Id.* at 36.  Malloch claimed he touched C.P.'s breast to see if she was developing and said

he was not sure if he was awake when he put his finger in her vagina:

> MR. MALLOCH: I--with the hand thing, it was a--I mean, does she have boobs, kind of a thin[g], you know, at--at this age, and--
> DETECTIVE: So, you were curious if she had breasts, or--
> MR. MALLOCH: Yeah.
> DETECTIVE: What about the hands in the pants thing?  You were not asleep.
> MR. MALLOCH: Okay, maybe I was--I--
> DETECTIVE: There's no "maybe"--
> MR. MALLOCH: No, no--
> DETECTIVE: --you were either awake, you weren't awake, that--I don't want to dance around playing this game.

*Id.* at 38.  Later on, Detective Lauer asked Malloch how long his finger was in C.P.'s

vagina, which led to Malloch saying for the first time that he was awake at the time, but

which he then appeared to take back:

> DETECTIVE: How long was your finger inside of her?
> MR. MALLOCH: Two seconds, three seconds.
> DETECTIVE: Okay.  And, how do you know that?
> MR. MALLOCH: I just--well, I mean, because I--when I--I still believe that I woke up from it.  I--I understand you don't believe it, but--and--and, I don't know how I need--how I get that--or, how I get it out of myself, that I wasn't asleep.
> DETECTIVE: Maybe you've tried to convince yourself all these years that you--you were (sic) awake, that was a conscious decision.  That doesn't happen--that doesn't happen.
> MR. MALLOCH: It happens to my wife, or with me and my wife.
> DETECTIVE: I've talked to your wife.  It doesn't happen in your sleep. Your wife doesn't believe it.  I mean, I'm sorry to tell you that--that she doesn't.  Nobody's gonna believe that--that story.  And, what that--what that shows is, a young man unwilling to accept responsibility, that's what that says to me, that's what I recognize.  And, all I want you to do here is tell the truth.

MR. MALLOCH: Okay.
DETECTIVE: That's all I want, is the truth. And--and we investigate--
MR. MALLOCH: I laid down with her, and after she was asleep for a while, put my hand down her pants and touched her.
DETECTIVE: And, how long did you do that?
MR. MALLOCH: A few seconds.
DETECTIVE: Why just a few seconds?
MR. MALLOCH: Because, I--reality kicked in.
DETECTIVE: Was it that you woke up?
MR. MALLOCH: Well, see that's what--
DETECTIVE: Yeah, I--I think you're just playing games here.
MR. MALLOCH: Well, I--
DETECTIVE: I'm not trying--I'm not trying to tell you--
MR. MALLOCH: --you're trying to tell me what I need to say.
DETECTIVE: No, I'm not tell--I will not tell you what to say. I am telling you, tell the truth.

*Id.* at 42-43. Malloch claimed he was telling the truth. Detective Lauer stated that he had to determine whether Malloch was a pedophile or a pervert or whether he was a guy who made a mistake. When Malloch continued to say he was asleep, Detective Lauer called the claim "hogwash." *Id.* at 52. He also said that Malloch was "not man enough to accept responsibility." *Id.* at 57. Soon after, Detective Lauer told Malloch he could tell his story to a jury, and Malloch admitted for a second time that he was awake when he put his finger in C.P.'s vagina:

DETECTIVE: That may be what you've tried to convince yourself all this time, but--and, I'll tell you what, Steve, I'm not gonna spend much more time here listen--listening to this, because I will just arrest you and you can go into court and you can tell 12 people--first of all, you can make your daughter get up and testify against you, and then you can tell 12 people, 'Yes, I was sleeping, and I woke up, and my hand was inside her vagina. Oh, and by the way, I also stuck my hand up her shirt to make sure she had breasts.'
MR. MALLOCH: And, so I laid down with her, and woke up, put my hand down her pants, realized it was wrong, pulled my hand out, and she woke up at that point and kicked me out of bed.

8

> DETECTIVE: Is that true, or are you just trying to--I want to know what the truth is. I don't want to put words in your mouth, I want to hear you tell me what happened, what was going through your head when that happened. Because, that's what's important, what's going on up here--
> MR. MALLOCH: Right.
> DETECTIVE: --and what's going on right now are the important things. Whether you're man enough to accept responsibility, and show a judge that you're remorseful, and how you show remorseful is by saying, 'Yes, this is what I did, it's never gonna happen again, I learned my lesson.'

*Id.* at 58-59. However, Malloch later indicated that he was asleep: "I remember laying down, with my back to her, and I remember waking up, pulling my hand out of her pants, and getting kicked on to the floor, and then getting into my bed. I can't remember the-- initiating it. I cannot remember that." *Id.* at 62-63.

When Malloch continued to insist that he could not remember consciously putting his finger in C.P.'s vagina, Detective Lauer said, "You know why you can't remember it . . . it's dawning on me now, because you're one of the one percenter guys." *Id.* at 66. He also said, "You don't have the stones to say it, that's the problem." *Id.* at 67. At the conclusion of the interview, Detective Lauer arrested Malloch and told him he would come back in if Malloch wanted to talk further. The entire first interview was about an hour and twenty-five minutes.

Detective Lauer turned Malloch over to Jeremy Heffelfinger, the intake officer, and had nothing to do with where he was placed in the jail. It took about an hour for Malloch to go through the intake process and make a phone call. Heffelfinger then placed Malloch twenty feet from his desk in a cell with Jeffrey Cain, an accused murderer. Heffelfinger placed Malloch there so he could monitor any shock Malloch might have from being in jail for the first time and being charged with a severe crime. It

9

was also the only available space. Although one other holding cell had just one man in it, that person was a trouble maker, which was in stark contrast to Cain, who had never caused any problems in the year and a half that he was at the jail.

Heffelfinger monitored Malloch the entire time he was in the cell. He did not notice any problems or tension between Malloch and Cain, and neither inmate indicated there were any problems. About four hours after Malloch's first interview ended, Cain got Heffelfinger's attention and said that Malloch wanted to speak with him. Malloch asked to speak with Detective Lauer.

Malloch was escorted out of the jail and back to Detective Lauer's office. Detective Lauer again read Malloch his *Miranda* rights, and Malloch indicated that he understood them. Malloch then asked if he was "best advised to speak to a lawyer." *Id.* at 74. Detective Lauer said that it was Malloch's decision and that he could not guide him one way or the other. After a brief discussion, Malloch said, "I'll talk." *Id.* at 75.

Detective Lauer was not accusatory during this second interview. Malloch said that he had "not good thoughts" about C.P. since 2003. He then admitted he was awake and consciously fingered C.P.:

> MR. MALLOCH: But, it happened to be--yeah, I didn't want to hurt her, she happened to be asleep, and I failed to control myself.
> DETECTIVE: So, can you tell me then what happened that particular day?
> MR. MALLOCH: I remember--yeah, laying down--falling asleep, waking up, and this has come to me as I'm laying out there, put my--curious, or whatever, put my hand down there, she stirred, pulled my hand out, and then had gotten kicked out of the bed.

*Id.* at 77. Detective Lauer gave Malloch an opportunity to write C.P. a letter of apology.

10

The State charged Malloch with two counts of child molesting, one as a Class A felony and one as a Class C felony. In December 2010, Malloch moved to dismiss the Class C felony on the basis that it was filed beyond the statute of limitations period and moved to suppress his statements to Detective Lauer on the basis that they were involuntarily made. After a hearing, the trial court dismissed the Class C felony and denied the motion to suppress.

Malloch had a trial in June 2011, but the jury deadlocked. The court declared a mistrial and immediately scheduled a second jury trial for September 12, 13, and 14, 2011. On September 9, 2011, Malloch moved for a continuance in order to secure the attendance of Dr. Neeraj Kaplish, a sleep expert from Ann Arbor, Michigan, who had treated Malloch. At a hearing on the same day, the trial court denied the continuance.

At trial, C.P., Detective Lauer, and Heffelfinger testified for the State. During the State's direct examination of Detective Lauer, the video recordings of Malloch's two interviews at the Sheriff's Department as well as his letter of apology were admitted over objection. The State played both video recordings during trial.

Malloch, Anita, Cain, and a variety of character witnesses testified for the defense. Malloch's defense was that he suffered from sexsomnia, which caused him to engage in sexual behavior while asleep, that he was asleep when he put his finger in C.P.'s vagina, and that his confession was coerced.

During deliberations, the jury requested to watch the first interview again in its entirety. After discussing the matter with the parties, the trial court permitted the jury to do so. The jury found Malloch guilty, and the trial court sentenced him to twenty-eight

11

years executed and two years suspended to probation. Malloch now appeals his conviction.

DISCUSSION AND DECISION

I. MOTION FOR CONTINUANCE

Malloch first contends that the trial court abused its discretion by denying his motion for continuance. He does not argue that he was entitled to a continuance by statute. *See* Ind. Code § 35-36-7-1 (1981). We review a trial court's ruling on a continuance not required by statute for an abuse of discretion. *Carter v. State*, 686 N.E.2d 1254, 1261 (Ind. 1997). The denial of a motion for continuance is reversible only when it constitutes an abuse of discretion and the record demonstrates that the defendant was prejudiced. *Beverly v. State*, 543 N.E.2d 1111, 1113 (Ind. 1989).

After the mistrial, Malloch notified the State that he intended to call Dr. Kaplish as a witness on retrial. At a discovery deposition on September 1, 2011, Dr. Kaplish acknowledged that he had been served a subpoena for trial but did not know whether he would be able to attend or whether he could be available for an evidentiary deposition to preserve his testimony in advance of trial. Malloch later learned that Dr. Kaplish was out of his office and would not return until September 13, 2011. He spoke with a representative from Dr. Kaplish's office about getting a firm commitment but was not told until late September 8, 2011, that Dr. Kaplish would be unavailable on the morning of September 14, 2011.

On September 9, 2011, Malloch moved for a continuance in order to secure the attendance of Dr. Kaplish. After arguments at a hearing on the same day, the trial court

12

denied the continuance, noting several reasons: (1) that the parties agreed on the second trial date at a conference immediately following the mistrial; (2) that Dr. Kaplish, from Michigan, was served with an unenforceable Indiana subpoena despite the fact that the trial court at a previous conference sua sponte raised the issue of whether the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings was followed; (3) that Dr. Kaplish was consulted as early as February 2010 yet no evidentiary deposition of him existed for trial; and (4) that the court's calendar was too congested to reset trial for 2011, and further delay was unacceptable considering the case was filed almost two years before and involved an incident occurring seven years ago.

On the first day of trial, Malloch renewed his objection and again noted that Dr. Kaplish would return to his Ann Arbor office the next day. However, he gave the court no assurances that Dr. Kaplish would actually appear or any indication that he had been properly subpoenaed. The court noted the objection but declined to change its ruling. During trial, Malloch made no attempt to have Dr. Kaplish declared unavailable so that he could enter his discovery deposition testimony into evidence.

Malloch claims that Dr. Kaplish would have been "potentially" available upon his anticipated September 13, 2011, return to his office. Appellant's Br. p. 39. He then cites *Flowers v. State*, 654 N.E.2d 1124 (Ind. 1995), where the Supreme Court concluded that the denial of a one-day continuance was an abuse of discretion. The crimes in *Flowers* occurred in May 1991, and trial occurred in November 1992. After the defendant's DNA expert withdrew from the case in early November 1992, the defendant secured a new DNA expert; however, the new expert would not be prepared for trial until November 20,

13

1992.  On the afternoon of November 19, 1992, just prior to the conclusion of the defense presentation, save for the new expert's testimony, the trial court denied the defendant's request for a one-day continuance.  The Supreme Court concluded that the denial was an abuse of discretion.

*Flowers* is distinguishable for two reasons.  First, the expert in *Flowers* was ready to testify the day after the defense presentation.  In contrast, the record here is devoid of any indication that Dr. Kaplish ever intended to appear.  There is no evidence that he was ever properly subpoenaed, and at the September 1, 2011, discovery deposition, he would not commit to appearing at trial.  He was out of the office until September 13, 2011, and was further unavailable on the morning of September 14, 2011.  When Malloch renewed his objection on the first day of trial, he made no record as to when Dr. Kaplish would be available to testify.  Second, *Flowers* involved a one-day continuance for a crime that was eighteen months old.  Here, the crime was seven years old, and the trial court could not reset the case for trial until the following year.

Given all of the circumstances before it, the trial court was well within its discretion in denying the motion for continuance.

## II. MALLOCH'S STATEMENTS

Malloch next contends that the trial court erred by admitting into evidence his statements to Detective Lauer during the two videorecorded interviews.  Specifically, he claims that the *Miranda* warnings before the first interview were inadequately administered, that he invoked his right to counsel before the second interview, and that

his statements in both interviews were involuntary under the state and federal constitutions.

A. *Miranda* Warnings Before First Interview

Malloch argues that Detective Lauer minimized the importance of the *Miranda* warnings by characterizing them as a mere formality to be recited only because Malloch was at the Sheriff's Department. He also argues that they were "administered in an offhand fashion." Appellant's Br. p. 28.

As established in *Miranda v. Arizona*, before questioning a person taken into custody, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In determining whether a defendant has received a clear, understandable warning of his rights, we must examine the words in the context used, considering the age, background, and intelligence of the individual being interrogated. *Sotelo v. State*, 264 Ind. 298, 342 N.E.2d 844, 847 (1976). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

Detective Lauer read Malloch his *Miranda* rights before the first interview as follows:

> DETECTIVE: Okay, just to let you know, you're not under arrest, you came here voluntarily, but since we're here at the Sheriff's Department I have to read you this form in here.
> MR. MALLOCH: Okay.
> DETECTIVE: You work for Nucor do you?

MR. MALLOCH: Yeah.
DETECTIVE: And, Monday through Friday type thing?
MR. MALLOCH: Yeah.
DETECTIVE: So you're not in the factory end of it?
MR. MALLOCH: No.
DETECTIVE: In the office.
DETECTIVE: You know Tyler Leffler?
MR. MALLOCH: Yes.
DETECTIVE: He's in the reserves here.
MR. MALLOCH: Uh-huh (affirmative).
DETECTIVE: Okay. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer one will be appointed to represent you at County expense before questioning, if you wish. If you give up your right to remain silent and later wish to stop answering questions, no further questions will be asked. Do you understand all that?
MR. MALLOCH: Yes.
DETECTIVE: Any questions about that at all?
MR. MALLOCH: No.
DETECTIVE: Okay. Having those rights in mind, do you wish to talk to me?
MR. MALLOCH: Yes.

Defendant's Ex. A, pp. 4-5.

We cannot agree that Detective Lauer characterized the *Miranda* warnings in any improper way. Instead, he simply told Malloch that he was informing him of his rights even though Malloch voluntarily came in for the interview and was not under arrest. Then, after a brief exchange about Malloch's employment, Detective Lauer gave him a full advisement of his *Miranda* rights. Malloch indicated that he understood them, had no questions about them, and wished to waive them.

Malloch nonetheless claims in a footnote that "and will" in the phrase "can and will be used against you" was barely audible and, combined with the other facts of this case, requires reversal. *See* Appellant's Br. p. 28 n.30. This argument acknowledges that

16

"and will" was not left out of the language of the advisement and challenges only the volume at which it was said. However, Malloch does not argue that he did not hear it or did not understand the advisement.

We find nothing improper in Detective Lauer's presentation of Malloch's rights. Moreover, Malloch claims no deficiency in his understanding and knowing waiver of his rights. We therefore find no error.

## B. Right to Counsel

Malloch argues that he unambiguously and unequivocally invoked his right to counsel before the second interview and that he resignedly agreed to talk only after Detective Lauer improperly dissuaded him from that right.

Pursuant to *Miranda*, any person subject to a custodial interrogation has the right to counsel. *Sauerheber v. State*, 698 N.E.2d 796, 801 (Ind. 1998). If an accused requests counsel, the interrogation must cease until an attorney is present. *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010). The request for counsel, however, must be unambiguous and unequivocal. *Id.* "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the interrogation need not cease. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

Before the second interview, Detective Lauer again read Malloch his *Miranda* rights, and Malloch again indicated that he understood them. The following exchange then occurred:

MR. MALLOCH: I--is it--this is what I wanted to ask when you initially came down. Is it best advised to speak to a lawyer?

DETECTIVE: I can't answer that for you, that's a decision that you have to--I can't guide you one way or the other on that.

MR. MALLOCH: (No response.)

DETECTIVE: Did you talk to your wife, at all?

MR. MALLOCH: Yes. Yeah, and I--I asked her to--you know, to get a hold of an attorney. But, I just--

DETECTIVE: You just can't really do that on a Friday night.

MR. MALLOCH: Well, right. And, I--I just--I--stuff's--I--I--I guess I really shouldn't, should I--I mean, if--either I'm gonna, or I'm not talk, right. I mean--

DETECTIVE: Yeah, either you're gonna, or you're not. I mean, you--you've, in essence, told what happened--

MR. MALLOCH: Right.

DETECTIVE: --I mean, we're just that far away. But, you're--it's your decision, your call.

MR. MALLOCH: I'll talk.

Defendant's Ex. A, pp. 74-75.

Malloch's question of whether it was "best advised" to speak with a lawyer does not signify that he wanted counsel. Instead, he merely solicited an opinion as to whether he should get one. *See Bean v. State*, 913 N.E.2d 243, 251 (Ind. Ct. App. 2009) ("What about an attorney?" not invocation of right to counsel), *trans. denied*; *Collins v. State*, 873 N.E.2d 149, 156 (Ind. Ct. App. 2007) ("Do I need an attorney?" and "I probably need an attorney" not invocation of right to counsel), *trans. denied*.

After Detective Lauer told him he could not guide him one way or the other, they both sat silent. Detective Lauer then asked whether Malloch had spoken to his wife. Malloch responded, "Yes. Yeah, and I--I asked her to--you know, to get a hold of an attorney. But, I just--" In this statement, Malloch said that he asked his wife to contact an attorney. However, his indecision and uncertainty is evident both by the fact that he

18

had just asked whether he should get an attorney and by the fact that he followed his statement with "But, I just--" Although Malloch appears to argue that Detective Lauer somehow swayed him into equivocating by saying that he would not be able to get an attorney on a Friday night, Detective Lauer testified at trial that he was merely finishing Malloch's sentence. In any event, it is clear that Malloch was equivocal before Detective Lauer interjected.

After some stuttering, Malloch then laid out his choices as either talking or not talking. Detective Lauer agreed with this. After another pause, Detective Lauer noted that Malloch had already told him "in essence" what had occurred but reiterated that the question of counsel was "your decision, your call." After another pause, Malloch made a clear choice: "I'll talk."

None of Malloch's utterances amounted to an unambiguous and unequivocal invocation of the right to counsel. His claim in this regard therefore fails.

### C. Voluntariness of Statements

Malloch argues that his statements in both interviews were involuntary under the state and federal constitutions. He claims that his confession was the result of promises of leniency or mitigated punishment and that his will was overborne.

If a defendant challenges the voluntariness of a confession under the United States Constitution, the State must prove the statement was voluntarily given by a preponderance of the evidence. *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005). The Indiana Constitution, however, requires the State to prove beyond a reasonable doubt that

19

the defendant voluntarily waived his rights and that the confession was voluntarily given. *Id.* at 114-15.

When evaluating a claim that a statement was not given voluntarily, the trial court is to consider the totality of the circumstances, including whether there is police coercion, the length, location, and continuity of the interrogation, and the maturity, education, physical condition, and mental health of the defendant. *Id.* at 115. On appeal, we do not reweigh the evidence but instead examine the record for substantial, probative evidence of voluntariness. *Id.* We examine the evidence most favorable to the State, together with the reasonable inferences that can be drawn therefrom. *Id.* If there is substantial evidence to support the trial court's conclusion, it will not be set aside. *Id.*

Malloch argues that Detective Lauer obtained a false confession with promises of leniency or mitigated punishment. A confession is inadmissible if it is obtained by promises of mitigation or immunity; however, vague and indefinite statements by the police that it would be in a defendant's best interest if he cooperated do not render a subsequent confession inadmissible. *Clark v. State*, 808 N.E.2d 1183, 1191 (Ind. 2004).

Here, Malloch claims that Detective Lauer promised leniency or mitigated punishment by comparing an employed person who steals a cell phone accessory to an unemployed person who steals a can of chicken to feed his family and then indicating that the latter was the kind of person "you're gonna want to work [with]." Defendant's Ex. A, p. 32. He also claims that Detective Lauer indicated that he would let him off the hook if he confessed: "I don't want you to walk out of here, I don't want to go to bed tonight thinking, I just let this . . . guy go out, who's gonna go out and--and victimize

20

other people, okay?  The only way I can know that it's done, and over with, is by you [confessing and saying it was a mistake]." *Id.* at 37.  Malloch further points to Detective Lauer's response after the second time Malloch admitted to being awake at the time he fingered C.P.  At that time, Detective Lauer said he wanted to be sure that Malloch was telling the truth and that "what's going on right now are the important things.  Whether you're man enough to accept responsibility, and show a judge that you're remorseful, and how you show remorseful is by saying, 'Yes, this is what I did, it's never gonna happen again, I learned my lesson.'" *Id.* at 59.

These statements are too vague and indefinite to constitute promises of leniency or mitigated punishment.  *See Clark*, 808 N.E.2d at 1191 (statements by detective that "there's a way you can work around this" and that defendant would not have a future unless he was honest about what happened did not constitute promises or threats that rendered confession involuntary); *Turner v. State*, 682 N.E.2d 491, 494-95 (Ind. 1997) (officer's statement that defendant should tell the truth to help himself did not constitute promise of leniency); *Martin v. State*, 779 N.E.2d 1235, 1241-42 (Ind. Ct. App. 2002) (statement by authorities that defendant would probably go home if he just told the truth did not render statement involuntary), *trans. denied*.

Malloch also argues that his will was overborne by Detective Lauer's interrogation tactics.  A confession is voluntary if it is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.  *Scalissi v. State*, 759 N.E.2d 618, 621 (Ind. 2001).  The critical inquiry is whether the defendant's statements were induced by

21

violence, threats, promises, or other improper influence. *Id.* While deceptive police interrogation tactics weigh heavily against the voluntariness of a confession, *Henry v. State*, 738 N.E.2d 663, 665 (Ind. 2000), they do not automatically render a confession inadmissible, *Clark*, 808 N.E.2d at 1191. Rather, they must be considered in light of the totality of the circumstances. *Id.*

Here, Malloch notes that Detective Lauer asserted forty-nine times that Malloch was awake and consciously touched C.P., that he urged Malloch to tell the truth but then dismissed him when he claimed to be asleep, and that he frequently challenged Malloch's manhood in light of his failure to take responsibility. Malloch also claims that he was bullied by Detective Lauer when he was sarcastically told that he was a "great guy," an "[o]utstanding individual," and a "sleep fondler" who "just need[ed] some kind of sleep test." Defendant's Ex. A, pp. 51, 67. Malloch further asserts that he was worn down by Detective Lauer's accusations of other disturbing acts, for example, that maybe Malloch had married Anita to gain access to C.P., and that he may one day fall asleep with his son, wake up, and "just fondle the heck out of [his] penis." *Id.* at 60.

Detective Lauer asserted, repeatedly and falsely, that his investigation clearly established that Malloch intentionally touched C.P. However, his deception does not necessarily render the confession involuntary. *See Henry*, 738 N.E.2d at 664-65 (officers falsely telling defendant that his fingerprints were found at crime scene and that a witness identified him did not render confession inadmissible); *Light v. State*, 547 N.E.2d 1073, 1078-79 (Ind. 1989) (officer lying to defendant, who asserted mental slowness, that incriminating letter existed and using technique of persistently positing defendant's guilt

22

in every question did not render confession inadmissible even where interrogation lasted four hours).

We have examined each of Detective Lauer's statements that Malloch highlights on appeal. In considering the totality of the circumstances, we also note that Malloch was thirty-five years old at the time of the interviews, had an associate's degree in architectural engineering, and supported his family with a job as a network engineer. Before each interview, he was read his *Miranda* rights and indicated that he understood them. As we concluded above, Malloch did not request an attorney, and Detective Lauer made no promises in order to get the confession. Further, there is no indication, nor does Malloch suggest, that he was intoxicated or sleep-deprived. The second phase of the first interview, the only portion in which Detective Lauer was confrontational in his questioning, lasted just under an hour.

We acknowledge that Detective Lauer's interrogation of Malloch was confrontational and intense in light of the serious offenses being investigated. Nonetheless, after our own careful review of the video recordings and consideration of the totality of the circumstances, we conclude that there is substantial evidence to support the trial court's conclusion that Malloch's statements in both interviews were voluntary under federal and state standards of review. *See Henry*, 738 N.E.2d at 665 (despite officer's obvious deception, State showed beyond reasonable doubt that confession was voluntary where defendant was of average intelligence, worked as a carpenter, was informed of *Miranda* rights, indicated he understood them, did not ask for attorney, was

not intoxicated or sleep-deprived, and where interrogation lasted about an hour and police made no threats or promises).

In spite of this substantial evidence, Malloch argues that his statements in the second interview were involuntary for two additional reasons. First, he points to Cain's trial testimony, in which he said he had been molested as a child and had "very little use" for child molesters. Tr. p. 536. Malloch argues that he was deliberately placed in a cell with Cain to pressure him into confessing. The record, however, clearly indicates that Detective Lauer had nothing to do with his placement, and Heffelfinger placed Malloch with Cain only because the cell was in a location that could be easily monitored and because no other space was available. Heffelfinger monitored Malloch while he was in the cell and escorted him back to Detective Lauer's office, and not once was there any indication that Cain's presence threatened Malloch. Moreover, while Malloch's self-serving testimony was that Cain had told him he did not like child molesters, Cain barely remembered Malloch at trial and did not say whether he had told Malloch that he disliked child molesters.

Second, Malloch argues that his confession consisted of information that was "fed" to him by Detective Lauer. He says that Detective Lauer introduced to him the idea that he was awake when he fingered C.P. and that he had had sexual thoughts about her. We disagree that Malloch was "fed" information such that his confession was involuntary. Malloch admitted from the start that he put his finger in C.P.'s vagina but claimed that he was asleep when he did so. Whether he was awake was therefore not "fed" to him but rather the central question in the case. As to sexual thoughts about C.P.,

24

Detective Lauer only asked if he had them. Malloch then offered multiple specific statements indicating that he did: that C.P. was a pretty girl, that she walked around in her underwear, that he would suppress thoughts when he saw her standing at a sink, and that he saw her breasts when he looked into the crack of her bedroom door as she was taking off her shirt. None of these details were provided by Detective Lauer.

Neither Malloch's placement with Cain nor his claim that he was "fed" information changes our conclusion that there is substantial evidence supporting the trial court's determination that his statements in both interviews were voluntary.

## III. DETECTIVE LAUER'S REPEATED ASSERTIONS OF GUILT

Malloch then contends that the trial court erred by allowing, without admonishment, Detective Lauer's repeated assertions of Malloch's guilt during the videorecorded interviews. He argues that the jury would likely assume the truth of Detective Lauer's assertions, particularly since they came from a law enforcement officer.

Because Malloch did not object to or request an admonishment regarding Detective Lauer's assertions of guilt, he argues that they constitute fundamental error. *See Konopasek v. State*, 946 N.E.2d 23, 27 (Ind. 2011) ("Failure to object to the admission of evidence at trial normally results in waiver and precludes appellate review unless its admission constitutes fundamental error."). The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010).

25

The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Id.* This exception is available only in egregious circumstances. *Id.* Such circumstances are not present here, as Malloch used those very assertions of guilt to try to persuade the jury that his confession was coerced.

The admissibility of a confession depends upon a determination by the trial judge that the confession was voluntary. *Morgan v. State*, 648 N.E.2d 1164, 1169-70 (Ind. Ct. App. 1995), *vacated on other grounds by Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind. 1996) (incorporating by reference this Court's discussion and decision regarding the admissibility of the confession). Once the confession has been admitted, it is evidence for the jury to consider. *Id.* The jury is the final arbiter of the value of the confession as evidence and may conclude that the confession was involuntary and reject it as evidence of guilt. *Id.* at 1170.

Here, although there was no specific court instruction to the jury of its prerogatives in considering the confession, the preliminary and final instructions both stated that the jurors were the "exclusive judges of the evidence" and that it was the jury's duty to decide the value of the exhibits and testimony. Tr. pp. 338, 776. Both the State and defense hotly contested the voluntariness of the confession before the jury.

During closing arguments, Malloch played for the jury an eleven-minute condensed video of the interviews, in which Detective Lauer repeatedly asserted his guilt as fact. *See* Defendant's Ex. R. He then argued:

26

How many times over the course of that interrogation did Detective Lauer tell Steve, hammer Steve that this was a[]waking, intentional act. How many times did he stress that point, beat on that point, pound on that point. It can tell you not asleep or awake, you weren't asleep Steve, you were awake, he said that seventeen (17) times. It was a conscious decision Steve, you did this consciously twenty[-]one (21) times. It was an intentional thing Steve four (4) times. That's over forty (40) times that he hammered on that point.

Tr. p. 757. Having relied on Detective Lauer's statements, he cannot now claim error, much less fundamental error, in the trial court's admission of those assertions without an admonishment he never requested. *See Baugh v. State*, 933 N.E.2d 1277, 1280 (Ind. 2010) ("Under the invited error doctrine, a party may not take advantage of an error that she commits, invites, or which is the natural consequence of her own neglect or misconduct." (internal quotation omitted)).

Moreover, the jury did not view the interviews in a vacuum. Before the jury watched the interviews, Detective Lauer testified that he used the Reid Technique, which he explained as nonaccusatory questioning followed by an accusatory phase in which the interrogator does most of the talking and claims that the investigation clearly shows that the suspect committed the crime. When asked if he "mean[t] all those things [he] sa[id] in the interrogation," he responded in the negative. Tr. p. 445. The jury was therefore apprised of the fact that Detective Lauer's assertions were not evidence of Malloch's guilt but representations made to elicit information. It was therefore not fundamental error for the trial court to admit those statements without an admonishment.

27

## IV. APOLOGY LETTER

Malloch also contends that the trial court erred by admitting his apology letter to C.P. He argues that his statements in the letter, like those in the interviews, were obtained as a result of the allegedly coercive interrogation. He also claims that asking him whether he wanted to write the letter was itself coercive because Detective Lauer presented it as a way to make amends but intended to use it as evidence against him.

Detective Lauer read Malloch his *Miranda* rights twice. He was thus informed twice that any of his statements could be used as evidence against him. For the same reasons noted in our discussion of the voluntariness of his interview statements, the totality of the circumstances also shows that the statements in his letter were voluntary. The trial court did not err by admitting this evidence.

## V. PROSECUTORIAL MISCONDUCT

Malloch finally contends that the State committed prosecutorial misconduct throughout the course of the trial. Specifically, he argues that the State improperly used voir dire to indoctrinate the jury, improperly impeached Anita, and made improper statements in closing arguments.

In reviewing a properly preserved claim of prosecutorial misconduct, we determine whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been otherwise subjected. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). To preserve a prosecutorial misconduct claim, the defendant must ask the trial court, at the time the misconduct occurs, to admonish the jury or move for a

28

mistrial if admonishment is inadequate. *Id.* Failure to request an admonishment or a mistrial waives the claim unless the defendant can demonstrate that the misconduct rises to the level of fundamental error. *Id.*

Malloch did not request an admonishment or a mistrial after any of the alleged instances of prosecutorial misconduct. He therefore operates under the heavy burden of showing fundamental error.

### A. Voir Dire

Malloch argues that the State committed misconduct by using voir dire to indoctrinate the jury. The purpose of voir dire is to discover whether any prospective juror has an opinion, belief, or bias that would affect or control his determination of the issues to be tried, thus providing a basis for a challenge. *Holmes v. State*, 671 N.E.2d 841, 854 (Ind. 1996), *abrogated on other grounds by Wilkes v. State*, 917 N.E.2d 675, 692-93 (Ind. 2009). The Supreme Court has condemned the practice of "permitting counsel to 'brainwash' or attempt to condition the jurors to receive the evidence with a jaundiced eye." *Robinson v. State*, 266 Ind. 604, 365 N.E.2d 1218, 1222 (1977). However, proper examination may include questions designed to disclose the jurors' attitudes about the type of offense charged. *Perryman v. State*, 830 N.E.2d 1005, 1008 (Ind. Ct. App. 2005).

Malloch asserts that the State predisposed the jury against him by asking the jury pool if they would be surprised to learn that child molesters will often get away with their crime by telling a complicit victim that the molestation is a secret. Tr. pp. 241-42. Malloch argues that the alleged misconduct became even clearer when the State later

29

noted that the case involved "the finger in the vagina of an eleven (11) year old five (5) [years] previous to us getting the case." *Id.* at 254.

We find no misconduct here. The case involved a molestation that occurred seven years before, so it was reasonable for the State to question whether the jury pool would believe a witness who had not revealed the abuse. Further, there is absolutely no indication that the State was trying to create an inference that, since the case involved an incident that occurred five years before charges were filed, Malloch must have forced C.P. to keep the molestation a secret. In fact, at the time the State said that the case involved "the finger in the vagina of an eleven (11) year old five (5) [years] previous to us getting the case," it was discussing the kind of evidence the jury pool might expect in a sex case.

Malloch also asserts that the State predisposed the jury against him by saying that they would have to discuss paraphilias like sadomasochism or frotteurism. The record shows that the State told the jury pool that the selected jurors would "have to talk about sexual things." *Id.* at 284. After listing exhibitionism, sadism, masochism, and fetishism, sexual behaviors of which the jury pool might have known, the State asked if they had heard of frotteurism, or "getting excited about secret touching." *Id.* at 285. Malloch says that this discussion had no evidentiary support.

We disagree. The State presented evidence at trial that Malloch touched C.P. twice while she was asleep. It was thus reasonable for the State to tell the jury pool that they might have to discuss sexual topics such as frotteurism. We acknowledge that the State noted other sexual behaviors that are more commonly known. Although we do not

30

condone the State's brief reference to these other behaviors, it did not place Malloch in grave peril.

In sum, the prosecutor's statements reflect permissible attempts to reveal the jury pool's ability to evaluate the child molesting case before them. We therefore conclude that the State did not commit prosecutorial misconduct in this regard.

### B. Impeachment

Malloch also argues that the State committed misconduct by improperly impeaching Anita twice during trial. Although a witness may be impeached with a prior inconsistent statement, once a witness has admitted having made such a statement, he has impeached himself and further evidence is unnecessary for impeachment purposes. *Appleton v. State*, 740 N.E.2d 122, 125 (Ind. 2001).

On direct, Anita testified that she did not know Malloch put his finger in C.P.'s vagina until December 2009. On cross, the State showed Anita a transcript of her statements to Detective Lauer on the day he began the investigation and asked if it was correct that she had just testified that C.P. did not tell her that Malloch had fingered her until 2009. Anita said it was correct. The following exchange occurred:

Q      But that's not really what you told Detective Lauer back in January of 2010 is it?
A      I did not go into detail with Detective Lauer at the time.
Q      You certainly left him with the impression though that you knew about the two (2) incidents since 2005 when [C.P.] told you that Steve had touched her.
A      I guess he could have had that impression, yes. I did not state specifically when she told me about what incident, I lumped it altogether and, uh, yeah, and that's what it states.
Q      That's what it looks like?
A      That's what it looks like.

31

Tr. p. 665.   Thus, Anita made a statement, the State confronted her with a prior inconsistent statement, and Anita admitted the prior inconsistent statement when she said, "[T]hat's what it states."   This should have been the end of the matter; however, the State then asked her to read the prior statement, and the following exchange occurred:

A      Um, she, you want me to read it correct?
Q      Yes, please.
A      Okay, um, she, well I went to [C.P.] and asked if anything had happened or anything and she said yes, there were two (2) incidents. That was, that the one was, details are a little sketchy, it's been awhile since we talked exactly about what happened but I believe one time was up her shirt, one time was down below where he had gone in her pants and described that it hurt.   Well, she asked me should that have hurt and that's when I knew.
Q      The implication being that's when you knew it had happened, right?
A      December 26th is when I learned of, that's when she asked me should it hurt and that's when I knew.
Q      You're saying you didn't know about this until Christmas of 2009?
A      I knew of the second incident December of 2009.

*Id.* at 666-67.

Because Anita admitted she made a prior inconsistent statement, the State should not have made her read it.   However, she was able to, in effect, rehabilitate herself when she read the statement and the State questioned her further.   That is, while she told Detective Lauer in the prior statement that she learned of both incidents, she clarified on the stand that she did not realize that the second incident specifically involved Malloch putting his finger in C.P.'s vagina until C.P. asked her if it should hurt.   We cannot say the State's improper impeachment placed Malloch in grave peril.

Later, the State elicited testimony that, around the time Anita learned of the incidents, Malloch had a good job that allowed her to stay at home to care for the

32

children, she had two boys with Malloch, including one with Down syndrome, and was six months pregnant with her third, and the family was getting ready to move into a nice rural home. Anita also testified that she was currently pregnant with her fourth child with Malloch. The following exchange then occurred:

Q    You didn't turn in the allegations from [C.P.] because it would have been pretty disruptive to your family, wouldn't it?
A    It would have been pretty disruptive but it's more disruptive five (5) year, five (5) years after the incident and going through all of this and there was no problem.
Q    But your excuse when you talked to Detective Lauer was exactly what I've just laid out for you, wasn't it? As to why you didn't turn it in back in 2005.
A    Um, that's in that paragraph here, yes.
Q    Would you like to read that for the jury, what you told him.
A    See I guess for me at that point I had just left my job and I mean it was just less than a week after I left my job to stay home and I was, I don't know, six (6) months pregnant and just not in a good, I was just devastated, I didn't know what to do but you know it was never left, it, it has never left me and now I am worrying about the boys, especially [N.], I mean he could never tell.

*Id.* at 690.

In this instance, Anita did not even make a statement at trial that was inconsistent with the prior statement. Instead, Anita confirmed what was going on in her life at the time she learned of the incidents, and the State then asked if she failed to report the incidents because it would have been disruptive to her family. Anita answered that it would have been disruptive, which is consistent with the prior statement the State then asked her to read. Thus, the State should not have made her read the prior statement. We note, though, that the paragraph the State asked her to read merely summed up the testimony she had just given and constituted but one paragraph in nearly seventy-four

33

pages of testimony. Having Anita read the prior statement therefore did not place Malloch in a position of grave peril, and any error was harmless. *See Appleton*, 740 N.E.2d at 126-27 (error in the State's line-by-line recitation of two witnesses' pretrial statements, consuming twelve pages of the trial transcript, was harmless where essentially the same evidence was already properly before the jury).

### C. Closing Arguments

Malloch next argues that the State committed misconduct by making improper statements in closing arguments.

First, Malloch claims that the State improperly repeated the false statement that no innocent person would give a false confession. The State opened its closing argument with, "Why would anyone confess to child molesting if they were not guilty?" and ended its closing argument with, "Who would confess if they are not guilty." Tr. pp. 729, 746. These statements were merely rhetorical questions serving as bookends to the State's closing argument, which maintained that the confession was voluntary and pointed out how Malloch's and Anita's testimony did not add up. Neither of these statements constitutes misconduct.

Malloch then made his closing argument, in which he urged the jury to conclude that his confession was coerced. In its final reply, the State said, "[N]obody, nobody who is not guilty is going to confess, it's not going to happen," and later said, "[H]e confessed as no person would do to child molesting unless they did it." *Id.* at 770, 773.

The State concedes that these are false statements but notes that the jury was also instructed that "[s]tatements made by the attorneys are not evidence." Appellant's App.

34

p. 286.  Malloch replies that such an instruction is not a cure-all for all instances of misconduct.  Indeed, in *Carter v. State*, 956 N.E.2d 167 (Ind. Ct. App. 2011), *trans. denied,* we rejected the State's argument that such an instruction necessarily cures a prosecutor's misconduct because it would mean that "nothing in a prosecutor's argument, no matter how egregious, inappropriate, unfair, prejudicial, or otherwise objectionable, could ever amount to 'misconduct'" as long as the jury was so instructed.  *Id.* at 172.

We agree with *Carter* that the fact that a jury is instructed that statements by attorneys are not evidence does not necessarily preclude a finding of prosecutorial misconduct in the State's closing argument.  However, in this case, the opening statements, the evidence presented at trial, and the closing arguments all made clear that the main controversy to be decided by the jury was whether Malloch's confession was voluntary or involuntary.  Under these circumstances, the State saying that no one would confess unless they were guilty was more in the way of vigorous advocacy than a statement to be taken as truth.  Malloch was not placed in a position of grave peril as a result of these statements; thus, there is no prosecutorial misconduct here.

Second, Malloch claims that the State improperly invited the jury to convict based on statements that had no basis in the evidence.  Generally, a prosecutor must confine closing argument to comments based upon the evidence presented in the record.  *Lambert v. State*, 743 N.E.2d 719, 734 (Ind. 2001).  The prosecutor may argue both law and facts and propound conclusions based upon his analysis of the evidence.  *Id.*

Malloch challenges several statements.  The State said, "[Malloch] thought [C.P.] wouldn't know because she was asleep, that is what frotteurism is, copping a feel when

35

you don't know." Tr. p. 745. Malloch argues that there was no evidence that he indulged in frotteurism or that frotteurism was even the type of behavior the State claimed it was. We agree that any definition of frotteurism was not in evidence. However, the gist of the statement was that Malloch intentionally touched C.P. while she was asleep. This is a fair comment on the evidence, which included Malloch's confession that he put his finger in her vagina while she was asleep. *See Cooper v. State*, 854 N.E.2d 831, 837 (Ind. 2006) (prosecutor's remarks in closing that defendant was a "back shooter" and "woman beater" were fair commentary on the facts introduced at trial); *Wrinkles v. State*, 749 N.E.2d 1179, 1197 (Ind. 2001) (prosecutor's references to defendant as a "psychopath" and "sociopathic" were fair characterizations of the evidence). The prosecutor's statement does not constitute misconduct.

The State also told the jury that the Reid Technique causes anxiety in the accused, causing visible signs "like stroking hair," "twitching," and being unable to "keep their hands still." Tr. p. 739. Detective Lauer did not testify about the visible signs of anxiety caused by the Reid Technique. We note, though, that it is evident from the statements that followed that the prosecutor was commenting on her perception of the technique's effect on Malloch: "[M]alloch went back to that cell and he couldn't live with it and [he] was too antsy that it boiled up in him and he had to get it out. That's effectively how Reid technique works, a pressure cooker and the truth comes boiling out." *Id.* To the extent the State engaged in misconduct, it does not rise to the level of fundamental error.

Malloch also challenges the statements that "there was brainwashing in this case but not by Steve Malloch. You don't have to believe what Anita Malloch told you," and

36

that Malloch was a "control person" who controlled both C.P. and Anita. *Id.* at 738, 771. These statements can be characterized as conclusions based on the prosecutor's analysis of the evidence. Malloch fingered C.P. when she was young, C.P. told Anita soon thereafter, and Anita immediately confronted Malloch. However, Anita and Malloch did not talk to C.P. about the incident and nothing was reported for five years. This silence could reasonably be inferred as a control mechanism supporting the State's argument. These arguments do not constitute prosecutorial misconduct.

Malloch also points to the State's claim that "we think [sex is] a physical act but for women it's largely a psychological act." *Id.* at 737. We see no basis in the evidence for this comment; however, its brief mention does not constitute fundamental error.[2]

Third, Malloch claims that the State improperly made inflammatory statements about Anita that invited the jurors to convict Malloch based on her conduct. For example, the State called Anita a "poor . . . mother," *id.*, pointed out the "ridiculousness [of] not getting help for [C.P.]," *id.*, and implied that she chose her husband over her daughter to protect "her meal ticket," *id.* at 771.

A prosecutor may comment on the credibility of a witness as long as the assertions are based on reasons arising from the evidence. *Lopez v. State*, 527 N.E.2d 1119, 1127 (Ind. 1988). This is precisely what the State did here. It permissibly argued that Anita's failure to report the incident or obtain any counseling for C.P. was based on wanting to keep Malloch at her side and that these motivations remained the same at trial.

---

[2] Malloch says the State argued that stepfathers were more likely than biological fathers to be guilty of child molesting and cites a page of the trial transcript. *See* Appellant's Br. p. 32. We find no such assertion in the State's closing argument.

Malloch nonetheless argues that the State cannot now claim on appeal that it was merely challenging her credibility because it relied on her credibility "when she talked about what she did and did not do with regard to C.P.'s initial claim." Appellant's Reply Br. p. 12. We agree with Malloch that the State did not intend the jury to disbelieve everything Anita said. The larger point, though, is that the State was entitled to argue that Anita's testimony supporting Malloch was not credible because her motivation was to keep him out of prison. This assertion is clearly based on the evidence, which showed that she stayed at home with their three sons, lived in a nice home, and was expecting a fourth child with Malloch at the time of trial. The State's actions do not constitute prosecutorial misconduct.

Finally, Malloch argues that the State's misconduct permeated the case and cumulatively amounts to fundamental error. We have concluded, however, that at most, only two isolated, brief remarks during closing argument constituted prosecutorial misconduct. These instances must be viewed in light of the evidence at trial, which included C.P.'s testimony and Malloch's confession. The jury was able to view the interactions between Malloch and Detective Lauer during both interviews and could thus evaluate the voluntariness of Malloch's confession against his claim of coercion and sexsomnia. Although Malloch did not receive a perfect trial, we are confident that he received a fair trial.

## CONCLUSION

For the reasons stated, we affirm Malloch's conviction.

Affirmed.

38

KIRSCH, J., and PYLE, J., concur.