## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 07 2017, 9:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Charles W. Lahey
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nyesha Crockett,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 7, 2017<br><br>Court of Appeals Case No.<br>71A03-1605-CR-1177<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable Jane Woodward<br>Miller, Judge<br><br>Trial Court Cause No.<br>71D01-1409-MR-10 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Nyesha Crockett was convicted of murder and battery resulting in serious bodily injury and the trial court sentenced her to an aggregate sentence of eighty years executed in the Indiana Department of Correction. Crockett appeals, raising three issues for our review: 1) whether the State failed to turn over exculpatory evidence in contravention of *Brady v. Maryland*, 2) whether the trial court abused its discretion in admitting evidence, and 3) whether Crockett's sentence is inappropriate in light of the nature of the offenses and her character. Concluding there is no *Brady* violation, the trial court did not abuse its discretion in admitting evidence, and Crockett's sentence is not inappropriate, we affirm.

# Facts and Procedural History

[2] Crockett and her boyfriend, Micahyah Grier, had two children together: A.C., nicknamed LayLay, who was born on October 13, 2012, and M.C., who was born on September 30, 2013. On February 1, 2014, Crockett and the children were at a friend's house where they were temporarily staying when Crockett left the home to visit with Grier. During this time, Crockett and Grier argued. When Crockett returned home, she entered her bedroom with the children. Shortly thereafter, Crockett exited the bedroom and explained to other individuals in the residence that A.C. was not breathing. Crockett called 911 and explained to the operator A.C. was lying down with a scarf around her neck. A.C. was then taken to a local hospital where she was treated by Dr.

Darley Emenim. When A.C. arrived at the hospital, Dr. Emenim observed she had no heartbeat. Doctors were able to restart A.C.'s heart, but she remains in a vegetative state to this day.

[3] Nearly six months later, on August 30, 2014, Crockett, Grier, and eleven-month-old M.C. were staying at Grier's mother's house. At some point, Grier and his friend, Tyeshun Johnson, left the home and Crockett followed the pair. Nearly three hours later, Crockett returned to the home and asked to borrow Grier's mother's cell phone. Because Grier did not have a phone, Crockett contacted Grier by calling Johnson's phone. Crockett then sent several text messages to Johnson's phone:

> 9:30 p.m.: Is [Grier] with you have him call me asap
> 9:23 p.m.: Imma leave him outside then
> 9:25 p.m.: Come get him before i hurt him
> 9:27 p.m.: Okay think i wont
> 9:51 p.m.: Good luck with everything and i hope you find your son

State's Ex. 17. Around the same time, Crockett sent Grier a message on Facebook: "Im Gonna Make Sure You Remember This Nite Just Like The Day With Laylay You Gone Go Party And Your Son Gone Be In Somebody Dumpster." State's Ex. 59. Crockett thereafter returned the phone to Grier's mother and entered a bedroom alone with M.C. At approximately 11:00 p.m., Crockett exited the room and stated to Grier's mother, "I can't do this anymore. . . . The same thing has happened to [M.C.] that's happened to [A.C.]" Transcript at 341-42. Grier's mother immediately went to M.C. and

discovered him lying on the floor, his lips blue. Law enforcement arrived on the scene shortly thereafter and performed CPR until paramedics arrived. At this point, several people were at the house and due to the commotion, Crockett was placed in the back of a law enforcement vehicle. Law enforcement then took Crockett to the hospital where M.C. was receiving care. When M.C. arrived at the emergency room, he was treated by Dr. Emenim, who later stated M.C. arrived at the hospital with no heart beat and no brain function. In caring for M.C., Dr. Emenim observed hemorrhaging in M.C.'s eyes consistent with strangulation. M.C. was later pronounced dead and the autopsy report indicates the cause of death was homicidal asphyxia.

[4] Crockett remained at the hospital until approximately 3:00 a.m. when law enforcement transported her to the St. Joseph County Sheriff's Office Metro Homicide Unit Headquarters. At the time, Crockett was not handcuffed and she did not object to being transported. Law enforcement allowed Crockett to bring with her a hospital blanket and further provided Crockett with an opportunity to sleep when she arrived at the station. At approximately 5:30 a.m., Detective Cook interviewed Crockett.[1] Detective Cook initiated the discussion by informing Crockett of her *Miranda* rights, asked if she understood, and provided her with a waiver form. Crockett acknowledged she understood her rights and signed the waiver.

---

[1] Throughout the interview, it does not appear law enforcement or Crockett knew M.C. had died in the hospital.

[5] During the interview, Crockett initially explained hospital staff told her A.C.'s injuries occurred due to a stroke. When Detective Cook asked what happened to M.C., Crockett explained she and M.C. were sleeping in the bedroom and when she woke up she observed M.C. was not breathing. About twenty-five minutes into the interview, Detective Cook confronted Crockett with the messages she sent to Johnson's phone. Crockett became tearful and admitted to shaking M.C. once but explained M.C. fell asleep thereafter. A few minutes later, Crockett admitted to shaking M.C. a couple of times. The discussion continued and Crockett later admitted to shaking M.C. until he stopped crying. Crockett claimed M.C. was still breathing at the time but he was making gurgling noises. Detective Cook thereafter provided Crockett with a doll and encouraged her to show how she shook M.C., which she did. About one hour and twenty minutes into the interview, Detective Cook left the room for a break, the first of six total breaks Crockett received.

[6] When Detective Cook returned from the break nearly five minutes later, he questioned Crockett about the circumstances surrounding A.C.'s injuries. Crockett denied injuring A.C. and explained A.C. enjoyed playing with scarves, implying A.C. must have been playing with the scarf and accidentally wrapped it around her neck. This portion of the interview lasted approximately twenty-five minutes. Detective Cook then exited the room for another five-minute break.

[7] Following another twenty-five-minute session, Crockett received another break. Twelve minutes into this break, Crockett requested Detective Cook return to

the room and admitted to choking A.C. with a scarf because she was angry with Grier. Detective Cook then focused the interview on M.C. Crockett admitted she shook M.C. multiple times and threw him on the floor. Later, Crockett admitted to choking M.C. with one of his shirts. When asked to clarify the sequence of events, Crockett admitted to choking M.C. with a t-shirt, then kicking him, and shaking him until he stopped crying. Including the six breaks, the interview lasted just under four and one-half hours. Crockett was arrested at the conclusion of the interview.

[8] The following day, Crockett requested another interview and spoke to Detective Cook. Detective Cook again read Crockett her *Miranda* rights. During this interview, Crockett denied being responsible for A.C.'s injuries. Confusingly, Crockett explained she previously admitted to harming A.C. because she feared Grier would accuse her of harming A.C. As to M.C., she acknowledged she put a shirt over his neck and kicked him, but denied she caused him to stop breathing.

[9] On September 2, 2014, the State charged Crockett with murder, battery resulting in serious bodily injury as a Class B felony, aggravated battery as a Level 1 felony, and neglect of a dependent causing death as a Level 1 felony. On August 18, 2015, Crockett moved to suppress evidence of her confession, arguing her statements made during the interview were not voluntary. At a hearing on the matter, the State presented a video recording of Crockett's interview and the testimony of Detective Cook. Detective Cook testified he has conducted hundreds of interviews over the course of his seventeen-year career

and does not employ any particular interrogation technique. On cross-examination, Crockett questioned Detective Cook as to specific interrogation training he received. Detective Cook explained he received training from numerous interrogation schools, including a Wicklander-Zulawski class in 2011. Detective Cook could not recall whether the Reid Technique was taught in the class.[2] When pressed whether he used "psychological techniques" to get Crockett to confess, Detective Cook stated, "It's a possibility I may have. I used techniques from a bunch of different things that I've learned, including what I've taught myself. I do not follow a set guideline for a certain interrogation, or interview technique." Tr. at 38.

[10] Crockett also testified and presented the testimony of her expert witness, Dr. Lawrence White. In sum, Dr. White, who has published a number of articles pertaining to false confessions, opined Crockett was coerced into talking with law enforcement. In addition, he noted his belief Detective Cook's interrogation style significantly matched the type of interviewing called for under the Reid Technique.

[11] In denying Crockett's motion to suppress, the trial court reviewed the discussions between Crockett and Detective Cook and concluded the State

---

[2] Crockett makes many assertions regarding the Reid Technique throughout her brief. However, she fails to explain what the Reid Technique is or what effect, if any, it has on this case. We have previously discussed the Reid Technique and described it as a technique used by police officers when interviewing or interrogating suspects. *See Malloch v. State*, 980 N.E.2d 887, 893 (Ind. Ct. App. 2012), *trans. denied*.

proved beyond a reasonable doubt Crockett's statements were made voluntarily, noting in relevant part,

> Although she did not complain about the behavior of the police when she met with them on September 1st, Crockett now contends her August 31 statements were involuntary and should be suppressed. She maintains she did not understand her rights. She says she agreed to an interview only because she thought she had to agree in order to reunite with her son. She alleges the police yelled at her and intimidated her during the interview.
>
> The recording of the August 31 interview belies Crockett's claims. Crockett was clearly advised of her Miranda rights. She was told she did not have to talk to the police. She was told that, if she choose [sic] to talk, she could end the interrogation at any time. She was *not* told she had to speak with police if she wished to see her son. She was not oppressed or deceived. Det. Cook was often skeptical of Crockett's story and occasionally raised his voice, but the detective did not yell at Crockett or threaten her in any way. Rather, whether by instinct or design, the detective was generally soft-spoken and solicitious [sic] of the young mother. Based on its review of the recorded interview, the Court does not find Crockett credible when she asserts she was intimidated by Det. Cook, was coerced by Det. Cook or that [she] made her statement against her will.

Appellant's Appendix, Volume 3 at 62-63 (emphasis in original) (footnote omitted). As to Dr. White's testimony, the trial court noted,

> Dr. Lawrence White also offered his opinion of the interview. . . . At defendant's request, Dr. White reviewed Crockett's August 31 statement. He did not meet with Crockett, he did not subject her to testing, nor, apparently did he request any records that would have supported her claims of post-partum depression and

anxiety. He also did not attempt to determine the investigating officers' training and experience in interrogation.

As he evaluated the August 31 interview, Dr. White noted several personal characteristics that might have made Crockett more vulnerable to confessing. However, Dr. White focused much of his criticism on Det. Cook's behavior during the interrogation. According to [Dr. White], Det. Cook isolated Crockett and used the disparity of power between Crockett and Cook to place himself in a position of dominance. He then reinforced this dominance by his behavior toward her. Dr. White contends that Crockett was helpless and felt she could extricate herself from this position only by confessing. [Dr. White] opined that Crockett was, therefore, bullied and coerced into talking to police.

The Court has considered Dr. White's testimony in arriving at a decision here. The value of his opinion has been diminished, however, by his apparent failure to consider Crocket's September 1 explanation for her confession. According to Crockett, factors external to the interrogation, specifically Crockett's concerns about [Grier] and his family, motivated her decision to confess. While perhaps there is a way to reconcile Crocket's explanation for her confession and [Dr. White's] opinion that the confession was coerced, Dr. White did not adequately harmonize the conflict.

*Id*. at 63-64 (footnotes omitted).

[12]     At trial, the State admitted evidence of Crockett's statements to Detective Cook. In addition, both Detective Cook and Dr. White provided essentially the same testimony they each provided at the hearing on Crockett's motion to suppress. On rebuttal, the State called Joseph Buckley, the president of Reid

and Associates where the Reid Technique first originated. Buckley testified Wicklander-Zulawski was founded by two former employees of Reid and Associates. However, Buckley opined that Detective Cook did not utilize the Reid Technique during his interview with Crockett.

[13] The jury found Crockett guilty as charged. The trial court entered judgment of conviction for murder and battery resulting in serious bodily injury and sentenced Crockett to eighty years executed in the Department of Correction. This appeal ensued. Additional facts will be added as necessary.

# Discussion and Decision

## I. *Brady* Violation

[14] In *Brady v. Maryland*, the Supreme Court of the United States held "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to prevail on a *Brady* claim, a defendant must establish the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material to an issue at trial. *Bunch v. State*, 964 N.E.2d 274, 297 (Ind. Ct. App. 2012), *trans. denied*. Evidence is deemed material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed to the defense. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The State will not, however, be found to have suppressed

material evidence if the evidence was available to the defendant through the exercise of reasonable diligence. *Id*. Evidence favorable to the defense includes both exculpatory and impeachment evidence. *Id*. at 297-98.

[15] Crockett contends the State did not fully disclose Detective Cook's training. Specifically, she claims Detective Cook was dishonest when he stated he was unfamiliar with the Reid Technique in light of Dr. White's and Buckley's testimony. She further argues the State "assisted in the cover-up" of Detective Cook's alleged misrepresentations when attempting to impeach Dr. White's testimony. Brief of Appellant at 13. However, as the State properly asserts, Crockett's argument relies on testimony the trial court was not required to credit and numerous assumptions we need not address. Put simply, Crockett completely fails to point to any piece of evidence relevant to these proceedings that was suppressed by the State. At both the suppression hearing and trial, Detective Cook was questioned at length by both the State and Crockett regarding the training he received at Wicklander-Zulawski and the methods he utilizes in interviewing criminal suspects. Detective Cook remained consistent with his testimony that he is neither familiar with nor utilizes the Reid Technique. Even assuming Detective Cook misled the trial court as to his knowledge and use of the Reid Technique, Crockett does not present any evidence showing the State had knowledge of this misrepresentation and used it against the defense when attempting to impeach Dr. White. We are hard-pressed to see how the State suppressed evidence in this case and conclude the State did not violate *Brady*.

# II. Admission of Evidence

## A. Standard of Review

[16] Crockett challenges the voluntariness of her confession under the United States Constitution. "If a defendant challenges the voluntariness of a confession under the United States Constitution, the [S]tate must prove the statement was voluntarily given by a preponderance of the evidence." *Pruitt v. State*, 834 N.E.2d 90, 114 (Ind. 2005). The decision to admit a defendant's statement is within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Ringo v. State*, 736 N.E.2d 1209, 1211 (Ind. 2000). In reviewing the trial court's decision to admit a defendant's statement, "we do not reweigh the evidence but instead examine the record for substantial probative evidence of voluntariness." *Id.*

## B. Confession

[17] Crockett claims the trial court abused its discretion in admitting the statements she made to Detective Cook because such statements were made involuntarily. We disagree.

[18] "A statement is voluntary if, in the light of the totality of the circumstances, the confession is the product of a rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *State v. Keller*, 845 N.E.2d 154, 165 (Ind. Ct. App. 2006) (citation and internal quotation marks omitted). In determining whether a statement is given voluntarily, the trial court must consider the

totality of the circumstances, including police coercion; the length, location, and continuity of the interrogation; and the defendant's maturity, education, physical condition, and mental health. *Pruitt*, 834 N.E.2d at 115.

[19] We have carefully reviewed the record and video recording of Crockett's interview with Detective Cook, and consistent with the trial court's conclusion and reasoning noted above, we fail to find any intimidation, threats, deception, coercion or any other notable factors raised by Crockett invalidating the voluntariness of her statements. In considering the totality of the circumstances, we note Crockett was twenty-one-years old at the time. She had completed her junior year of high school, but never graduated. Crockett was suffering from a cough at the beginning of the interview and also self-reported she suffered from post-partum depression and also anxiety, but as the trial court noted, these issues do not appear to affect the voluntariness of her statements:

> Crockett conversed easily with Det. Cook; she was not confused by his questions or the topics he discussed. She responded appropriately to the detective's inquiries. While probably weary and undoubtedly distressed, Crockett did not appear impaired by either fatigue or the strain of her child's situation. She was sometimes weepy and sometimes subdued, yet she remained attentive and engaged. On several occasions she corrected Det. Cook when she felt he had misstated her responses . . . . There was nothing either in Crockett's demeanor or in her discussions that suggested a particular vulnerability to interrogation.

Appellant's App., Vol. 3 at 66.

[20]  Prior to the interview, Crockett was escorted from the hospital to the homicide unit by law enforcement. During this time, she was not placed in handcuffs nor was she arrested. Law enforcement then placed Crockett in an interview room[3] and at no point during the interview did law enforcement restrain Crockett with handcuffs or shackles. Rather, Detective Cook allowed Crockett to wrap herself in a blanket and roam freely throughout the room. At the beginning of the interview, Detective Cook read Crockett her *Miranda* rights, Crockett indicated she understood, and Crockett thereafter waived those rights.

[21]  Throughout the interview, Detective Cook was polite and respectful. We certainly acknowledge Detective Cook raised his voice at times and pressed Crockett for answers, but there is nothing exceptional about this circumstance given the investigation into a grave injury to a child and this only occurred after Detective Cook felt Crockett was being dishonest. Even as Dr. White observed, Detective Cook did not make any promises, present false evidence, threaten Crockett, or physically harm her.[4] *See Malloch v. State*, 980 N.E.2d 887, 901-04 (Ind. Ct. App. 2012) (affirming a trial court's finding the defendant's confession to child molesting was voluntary on state and federal grounds despite the detective asserting forty-nine times the defendant was awake and consciously

---

[3] According to Detective Cook, the room was one of the largest interview rooms in the station.

[4] Crockett also argues Detective Cook's use of a doll was a manipulative tactic. The doll was originally introduced so Crockett could demonstrate how she shook M.C. As the interview continued, however, Detective Cook encouraged Crockett to treat the doll as a surrogate to her children. As the trial court noted, this was a disturbing portion of the interview to view, but "Crockett never appeared to have confused the doll with a human child." Appellant's App., Vol. 3 at 67 n.8.

touched the child, challenging the defendant's manhood, accusing the defendant of committing disturbing acts, berating him, and making false assertions regarding evidence), *trans. denied*.

[22] We further note the entire interview lasted only four and one-half hours, including six breaks. Despite being free to leave or terminate the interview, Crockett—on at least two occasions—ended a break early by requesting to speak further with Detective Cook. We conclude the State proved by a preponderance of the evidence Crockett's statements were voluntary under the United State Constitution.[5]

## III. Inappropriate Sentence

[23] Indiana Appellate Rule 7(B) provides, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden of persuading this court his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given

---

[5] To the extent Crockett also challenges her confession under the Indiana Constitution, we agree with the trial court the State presented evidence beyond a reasonable doubt showing Crockett's statements were voluntary. *See Pruitt*, 834 N.E.2d at 114-15 (Ind. 2005) (noting the Indiana Constitution requires the State to prove beyond a reasonable doubt the defendant's statement was voluntarily given).

case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of appellate review is to "leaven the outliers," not achieve the perceived "correct" result in each case. *Id.* at 1225.

[24] The advisory sentence is the starting point the legislature selected as an appropriate sentence for the crime committed. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). Here, Crockett was convicted of murder and battery resulting in serious bodily injury, a Class B felony. A person convicted of murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3. In addition, a person convicted of a Class B felony shall be imprisoned for a fixed term of between six and twenty years, with the advisory sentence being ten years. Ind. Code § 35-50-2-5(a). The trial court sentenced Crockett to sixty years executed for murder and twenty years executed for battery resulting in serious bodily injury, to be served consecutively for an aggregate sentence of eighty years executed in the Department of Correction.

[25] As to the nature of the offenses, we note Crockett was the mother of two infant children. Such a responsibility put her in a position of trust and care over the children. After choking A.C. with a scarf and leaving her in a vegetative state for the remainder of her life, Crockett also choked and killed her son, M.C. As to the character of the offender, we note nothing exceptional apart from the offenses she committed. Although Crockett claims she suffers from mental illnesses and is a victim of domestic abuse, there is no evidence in the record to

support these claims. We conclude Crockett's sentence is not inappropriate in light of the nature of the offenses and her character.

# Conclusion

[26] We conclude the State did not commit a *Brady* violation, the trial court did not abuse its discretion in admitting Crockett's statements, and Crockett's sentence is not inappropriate in light of the nature of the offenses and her character. Accordingly, we affirm.

[27] Affirmed.

Kirsch, J., and Barnes, J., concur.