

FILED

Nov 16 2023, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Steven E. Malloch,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

November 16, 2023

Court of Appeals Case No.
22A-PC-2053

Appeal from the DeKalb Superior
Court

The Honorable Monte L. Brown,
Judge

Trial Court Cause No.
17D02-1401-PC-000001

**Opinion by Judge May**
Chief Judge Altice and Judge Bradford concur.

**May, Judge.**

[1] Steven E. Malloch appeals following the denial of his petition for post-conviction relief. Malloch presents one issue, which we revise and restate as whether the post-conviction court erred when it determined Malloch's trial counsel did not provide ineffective assistance when he did not present expert testimony regarding:

> 1. the susceptibility of individuals to give false confessions; and

> 2. a sleep disorder called sexsomnia.

We affirm.

## Facts and Procedural History

[2] On direct appeal, we recited the pertinent facts regarding Malloch's underlying criminal conviction as follows:

> In 1998, Malloch began living with Anita Malloch and her four-year-old daughter C.P., who was born in 1993. Malloch and Anita married in 1999 and subsequently had three sons. C.P. had regular parenting time with her biological father but primarily lived in the Malloch home. She called Malloch "Dad."
>
> In 2003 and 2004, when C.P. was in fourth grade, the family lived in Auburn, Indiana, next to a cemetery. C.P. was sometimes scared at night because of the cemetery and would ask Anita or Malloch to lie down with her. On one occasion when Malloch lay with C.P., she awoke with his hand underneath her shirt on her breast. Malloch appeared to be asleep. C.P. removed his hand, rolled over, and went back to sleep. She never talked with him about the incident.

In June 2004, the family moved to a ten-acre property in Garrett, Indiana. They lived in a small apartment in a barn until March 2005, when construction of their house was completed. At some point while they lived in the barn, C.P. watched a werewolf movie and was scared to go to bed. She first asked Anita to lie down with her, but when Anita told her she was busy, she asked Malloch. C.P. fell asleep in her bed with Malloch beside her. When she woke up, Malloch's hand was in her underwear and his finger was in her vagina. Again, Malloch appeared to be asleep. C.P. pulled his hand out of her pants, crawled over him, and slept with her then-six-year-old brother in his bed. The next morning, Malloch asked C.P. why she ended up in her brother's bed. C.P. answered, "[B]ecause." She never asked him to lie down with her again.

At some point while the family still lived in the barn, Anita watched an episode of "Dr. Phil" about child molesting and asked C.P. whether she had ever been touched. C.P. told Anita what had happened with Malloch. When Anita confronted Malloch, he claimed that he did not know what Anita was talking about and that if anything had happened, it had happened while he was asleep.

Roughly five years later, Anita told her counselor about the two incidents. On January 22, 2010, Anita's counselor reported the matter to Jennifer Hupfer, a caseworker for the Department of Child Services, who in turn notified Detective Donald Lauer of the DeKalb County Sheriff's Department. Later that day, Hupfer and Detective Lauer went to the Malloch home and informed Malloch of the allegations. Malloch said he was asleep and woke up to find his finger in C.P.'s vagina. He agreed to go to the Sheriff's Department for a formal interview and drove himself there.

Detective Lauer conducted two interviews with Malloch in his office. Before the first interview, Detective Lauer read Malloch

his *Miranda* rights, and Malloch indicated that he understood them, had no questions about them, and wished to talk. During this interview, Detective Lauer employed the two-part Reid Technique, which he later described at trial as the "gold standard of . . . police interviewing." The first phase of the Reid Technique consists of nonaccusatory questioning. The interview then shifts to the second phase, where the questioner does most of the talking and claims that the investigation clearly shows that the suspect committed the crime. A questioner using the Reid Technique introduces "different minimizing themes," in essence excuses or justifications, to make it easier and more comfortable for the suspect to admit to the crime.

In the first phase here, Detective Lauer explained that his job was to separate the "small percentage of people . . . who prey on people" from "average good guys, like you and me, who make a mistake . . . and . . . accept responsibility." Malloch told Detective Lauer he was in bed with C.P. because she was scared, he woke to find his hand in her pants and his finger in her vagina, he pulled his hand out, and C.P. kicked him off the bed. He also admitted to the earlier incident, when his hand was underneath C.P.'s shirt on her breast, but claimed that he had woken up that way and thought she was asleep when he got up and went to his room.

Detective Lauer said he had to determine whether Malloch was asleep or not and whether he was a "bad guy" or "not so bad guy." Malloch claimed he was being honest. Detective Lauer then asked if he had ever had sexual thoughts about C.P. Malloch responded, "No . . .. . . I mean, she's a pretty girl, and, you know—and she walks around in—in her underwear at times, and stuff like that, but I—I'm always like, 'Put your clothes'—you know, 'Get clothes on,' I—you know, that 'You don't need to be doing that.'" Detective Lauer asked Malloch about a polygraph test, and Malloch responded that he would be willing

to take the test. Malloch said he felt responsible for the incidents because he was the adult and being asleep was not an excuse.

Detective Lauer then said C.P. had told him that at some point she was "sitting downstairs like in her underwear and bra and stuff, kind of inappropriate, I think, I mean she shouldn't of [sic] been doing that, I guess, I mean that's on—that's on her, I mean, she should . . . know better than to . . . be doing that."  Malloch later offered, "I would suppress the thought. You know, if—see her standing at the sink, or whatever, kind of a thing, you know, I—I would throw it out of my mind, I would say 'That's not right,' you know."  Malloch explained how he would walk away from the situation and offered this vignette: "[T]wo months ago, or something, walking upstairs, to go to bed, and [C.P.]'s door is cracked, and she was standing there taking off her shirt, and I mean, I saw her breasts, but then I went to my room."

Detective Lauer asked whether, assuming Malloch was awake, it was "kind of just a spur of the moment type thing, or—some guys actually will sit and plot out a way[.] . . . I call those people . . . the one percenters, those luckily are the—the people that are few and far between."  Malloch claimed it would have been spur of the moment. Detective Lauer then left the room. This portion of the interview was about thirty minutes.

When Detective Lauer returned, he sat closer to Malloch and said, "[M]y investigation clearly shows that you touched her, and you were awake when you did that, this was a conscious thing that you did."  Malloch said that he woke up to it, but Detective Lauer said:

> No, you were awake when you did it, . . . that was a conscious thing, . . . you were awake when you did that. Now, what I need to find out is certain other things like, was this a spur of the moment thing, you know, and that's

what we need to talk about, because, like I said, I've got to figure out what kind of guy is Steve.

Detective Lauer offered many minimizing themes, including that it was good that the incidents occurred when C.P. was asleep because maybe she would not remember what happened, that C.P. was a pretty girl and was "walking around half naked," that Malloch was a guy and was "gonna have those thoughts," that maybe there were "tough things going on" in Malloch's life at the time, and that maybe his wife "turned off the faucet and there wasn't any, you know, sexual activity or something." Malloch admitted that he was awake when he put his hand on C.P.'s breast:

> DETECTIVE: So, what I want to know, I guess, is—is—I mean, I can just keep babbling here, but I need to know what's going on—what was going on in your head when that happened., [sic] And, you were awake, don't tell me you—because, you—you—
>
> MR. MALLOCH: I—I—the hand in the shirt, yes.

Malloch claimed he touched C.P.'s breast to see if she was developing and said he was not sure if he was awake when he put his finger in her vagina:

> MR. MALLOCH: I—with the hand thing, it was a—I mean, does she have boobs, kind of a thin[g], you know, at—at this age, and—
>
> DETECTIVE: So, you were curious if she had breasts, or—
>
> MR. MALLOCH: Yeah.

DETECTIVE: What about the hands in the pants thing? You were not asleep.

MR. MALLOCH: Okay, maybe I was—I—

DETECTIVE: There's no "maybe"—

MR. MALLOCH: No, no—

DETECTIVE: —you were either awake, you weren't awake, that-I don't want to dance around playing this game.

Later on, Detective Lauer asked Malloch how long his finger was in C.P.'s vagina, which led to Malloch saying for the first time that he was awake at the time, but which he then appeared to take back:

DETECTIVE: How long was your finger inside of her?

MR. MALLOCH: Two seconds, three seconds.

DETECTIVE: Okay. And, how do you know that?

MR. MALLOCH: I just—well, I mean, because I—when I—I still believe that I woke up from it. I—I understand you don't believe it, but—and—and, I don't know how I need-how I get that—or, how I get it out of myself, that I wasn't asleep.

DETECTIVE: Maybe you've tried to convince yourself all these years that you—you were (sic) awake, that was a

conscious decision. That doesn't happen—that doesn't happen.

MR. MALLOCH: It happens to my wife, or with me and my wife.

DETECTIVE: I've talked to your wife. It doesn't happen in your sleep. Your wife doesn't believe it. I mean, I'm sorry to tell you that—that she doesn't. Nobody's gonna believe that—that story. And, what that—what that shows is, a young man unwilling to accept responsibility, that's what that says to me, that's what I recognize. And, all I want you to do here is tell the truth.

MR. MALLOCH: Okay.

DETECTIVE: That's all I want, is the truth. And—and we investigate—

MR. MALLOCH: I laid down with her, and after she was asleep for a while, put my hand down her pants and touched her.

DETECTIVE: And, how long did you do that?

MR. MALLOCH: A few seconds.

DETECTIVE: Why just a few seconds?

MR. MALLOCH: Because, I—reality kicked in.

DETECTIVE: Was it that you woke up?

MR. MALLOCH: Well, see that's what—

DETECTIVE: Yeah, I—I think you're just playing games here.

MR. MALLOCH: Well, I—

DETECTIVE: I'm not trying—I'm not trying to tell you—

MR. MALLOCH:—you're trying to tell me what I need to say.

DETECTIVE: No, I'm not tell—I will not tell you what to say. I am telling you, tell the truth.

Malloch claimed he was telling the truth. Detective Lauer stated that he had to determine whether Malloch was a pedophile or a pervert or whether he was a guy who made a mistake. When Malloch continued to say he was asleep, Detective Lauer called the claim "hogwash." He also said that Malloch was "not man enough to accept responsibility." Soon after, Detective Lauer told Malloch he could tell his story to a jury, and Malloch admitted for a second time that he was awake when he put his finger in C.P.'s vagina:

DETECTIVE: That may be what you've tried to convince yourself all this time, but—and, I'll tell you what, Steve, I'm not gonna spend much more time here listen—listening to this, because I will just arrest you and you can go into court and you can tell 12 people—first of all, you can make your daughter get up and testify against you, and then you can tell 12 people, 'Yes, I was sleeping, and I woke up, and my hand was inside her vagina. Oh, and by

the way, I also stuck my hand up her shirt to make sure she had breasts.'

MR. MALLOCH: And, so I laid down with her, and woke up, put my hand down her pants, realized it was wrong, pulled my hand out, and she woke up at that point and kicked me out of bed.

DETECTIVE: Is that true, or are you just trying to—I want to know what the truth is. I don't want to put words in your mouth, I want to hear you tell me what happened, what was going through your head when that happened. Because, that's what's important, what's going on up here—

MR. MALLOCH: Right.

DETECTIVE: —and what's going on right now are the important things. Whether you're man enough to accept responsibility, and show a judge that you're remorseful, and how you show remorseful is by saying, 'Yes, this is what I did, it's never gonna happen again, I learned my lesson.'

However, Malloch later indicated that he was asleep: "I remember laying down, with my back to her, and I remember waking up, pulling my hand out of her pants, and getting kicked on to the floor, and then getting into my bed. I can't remember the—initiating it. I cannot remember that."

When Malloch continued to insist that he could not remember consciously putting his finger in C.P.'s vagina, Detective Lauer said, "You know why you can't remember it . . . it's dawning on me now, because you're one of the one percenter guys." He also

said, "You don't have the stones to say it, that's the problem." At the conclusion of the interview, Detective Lauer arrested Malloch and told him he would come back in if Malloch wanted to talk further. The entire first interview was about an hour and twenty-five minutes.

Detective Lauer turned Malloch over to Jeremy Heffelfinger, the intake officer, and had nothing to do with where he was placed in the jail. It took about an hour for Malloch to go through the intake process and make a phone call. Heffelfinger then placed Malloch twenty feet from his desk in a cell with Jeffrey Cain, an accused murderer. Heffelfinger placed Malloch there so he could monitor any shock Malloch might have from being in jail for the first time and being charged with a severe crime. It was also the only available space. Although one other holding cell had just one man in it, that person was a trouble maker, which was in stark contrast to Cain, who had never caused any problems in the year and a half that he was at the jail.

Heffelfinger monitored Malloch the entire time he was in the cell. He did not notice any problems or tension between Malloch and Cain, and neither inmate indicated there were any problems. About four hours after Malloch's first interview ended, Cain got Heffelfinger's attention and said that Malloch wanted to speak with him. Malloch asked to speak with Detective Lauer.

Malloch was escorted out of the jail and back to Detective Lauer's office. Detective Lauer again read Malloch his *Miranda* rights, and Malloch indicated that he understood them. Malloch then asked if he was "best advised to speak to a lawyer." Detective Lauer said that it was Malloch's decision and that he could not guide him one way or the other. After a brief discussion, Malloch said, "I'll talk." Detective Lauer was not accusatory during this second interview. Malloch said that he had "not good thoughts" about C.P. since 2003. He then admitted he was awake and consciously fingered C.P.:

MR. MALLOCH: But, it happened to be—yeah, I didn't want to hurt her, she happened to be asleep, and I failed to control myself.

DETECTIVE: So, can you tell me then what happened that particular day?

MR. MALLOCH: I remember—yeah, laying down—falling asleep, waking up, and this has come to me as I'm laying out there, put my—curious, or whatever, put my hand down there, she stirred, pulled my hand out, and then had gotten kicked out of the bed.

Detective Lauer gave Malloch an opportunity to write C.P. a letter of apology.

The State charged Malloch with two counts of child molesting, one as a Class A felony and one as a Class C felony. In December 2010, Malloch moved to dismiss the Class C felony on the basis that it was filed beyond the statute of limitations period and moved to suppress his statements to Detective Lauer on the basis that they were involuntarily made. After a hearing, the trial court dismissed the Class C felony and denied the motion to suppress.

*Malloch v. State*, 980 N.E.2d 887, 892-97 (Ind. Ct. App. 2012) (internal Record citations and footnote omitted), *trans. denied*. The trial court held Malloch's first jury trial in June 2011. Malloch did not present any expert testimony during the first jury trial, and the jury deadlocked. The trial court declared a mistrial and immediately scheduled Malloch's retrial for September 12, 13, and 14, 2011.

On September 1, 2011, the parties took a discovery deposition of Dr. Neeraj Kaplish, a physician and clinical assistant professor at the University of Michigan, in Ann Arbor, Michigan. An associate general counsel with University of Michigan Health Systems represented Dr. Kaplish during the deposition. Dr. Kaplish testified regarding his curriculum vitae. He had completed two fellowships in sleep medicine and published on the topics of parasomnias and narcolepsy. He also explained that parasomnias "are unprovoked, unpleasant, complex motor behaviors that can occur out of sleep." (D.A. State's Ex. 1 at 38.)[1] For example, Dr. Kaplish observed that sleepwalking is an example of a parasomnia, and he explained that certain conditions, like sleep apnea, predispose someone to experience parasomnia. He also stated that sexsomnia is another type of parasomnia, and he described sexsomnia as "behavior at upper level sleep [that] has sexual connotation." (*Id.* at 10.) The activity "could range from sexual frantic moaning and groaning, to self-stimulation, to sexual assault and sexual intercourse." (*Id.* at 34.) Dr. Kaplish also explained that while he had read peer-reviewed articles about sexsomnia, he had not published on the topic, nor had he conducted any studies regarding sexsomnia. Dr. Kaplish's knowledge was limited to his review of the literature, and he did not know whether scientists had observed sexsomniac behavior in a lab setting or whether any rate of error had been

---

[1] This citation refers to State's Exhibit 1 in the record of Malloch's direct appeal and entered into evidence by the State during the September 9, 2011, hearing on Malloch's motion to continue his trial. Page number citations are to the page numbers listed on the deposition transcript.

established for the diagnosis. Dr. Kaplish also was not aware of what percentage of the general population had been diagnosed with sexsomnia.

[4] Dr. Kaplish reported he had consulted with Malloch for the first time in February of 2010 after Malloch's doctor in Fort Wayne referred Malloch to Dr. Kaplish. Dr. Kaplish ordered that Malloch undergo two sleep studies and found that Malloch had sleep apnea. Dr. Kaplish subsequently diagnosed Malloch with sexsomnia. Dr. Kaplish explained that Malloch was the only patient he had ever diagnosed with sexsomnia. Dr. Kaplish also acknowledged he relied on the personal history Malloch relayed to him in diagnosing Malloch and his diagnosis could be incorrect if Malloch had lied to him.

[5] Malloch's trial counsel, John Bohdan, asked Dr. Kaplish if he received the Indiana subpoena Attorney Bohdan had sent him regarding Malloch's trial. Dr. Kaplish acknowledged receipt of the subpoena, but he stated he was not sure if he would be available to testify at the time of Malloch's trial. Dr. Kaplish's attorney conveyed he would keep Attorney Bohdan apprised of Dr. Kaplish's availability.

[6] Once Attorney Bohdan definitively learned Dr. Kaplish was not available to testify at Malloch's trial, he filed a motion to continue the second trial. During a hearing on the motion on September 9, 2011, Attorney Bohdan explained he filed the continuance because Dr. Kaplish was unavailable to testify, and Dr. Kaplish had "offered the diagnosis that Steven Malloch does experience

parasomnia and specifically sexsomnia[.]" (D.A. Tr. Vol. I at 185.)[2]  Attorney

Bohdan described Dr. Kaplish's testimony as "critical[.]" (*Id.*)  He observed:

> [W]e had roughly ninety (90) days between the last trial and the currently scheduled trial and very early on in that process . . . as Mr. Malloch and I assessed what had happened in the first trial and assessed how to approach it in the second trial it became clear to us that the testimony of Dr. Kaplish . . . is more than adjunct or some little corollary testimony, it has a real value and a real importance in this case.  He had been previously identified as a potential witness.  Obviously, he wasn't called in the first trial . . . but we made the decision then that we need to call him in the second trial.

(*Id.* at 186.)  Attorney Bohdan noted that Dr. Kaplish's deposition for discovery

purposes occurred on September 1, 2011, and he stated that "at that time and

pretty much almost every business day since that deposition I have struggled . .

. to try to . . . get an answer as to availability for a live appearance at trial in this

cause or in the alternative to coordinate an evidentiary deposition." (*Id.* at

187.)  The State opposed Malloch's motion to continue.  The State summarized

the confession Malloch gave to Detective Lauer, and the State pointed to

portions of Dr. Kaplish's deposition testimony where Dr. Kaplish admitted the

limits of his knowledge about sexsomnia.  The State also noted that Dr. Kaplish

lived and practiced in Michigan and Attorney Bohdan failed to follow the

---

[2] We will refer to the Transcript produced for Malloch's direct appeal of his conviction as "D.A. Tr."  In contrast, we will designate the Transcript produced from Malloch's post-conviction proceedings as simply "Tr."

proper procedure for subpoenaing an out-of-state witness. The trial court denied Malloch's motion to continue.

[7] Malloch's second trial began on September 12, 2011. In his opening statement, Attorney Bohdan laid out Malloch's theory of the case, which was that Malloch "was badgered, pressured, tricked, cajoled, and coerced" into giving a false confession, (D.A. Tr. Vol. II at 351), and that he was asleep when his hand penetrated C.P.'s vagina. Attorney Bohdan explained:

> The evidence will show that the statements that the State seeks to build its case around . . . were not voluntary, were not valid and were not true and you'll be able on seeing these to see the signs that show you how that is possible, how that came to be. It will show these statements to be products of a clever interviewing technique. The State tells you well, this is generally referred to as [Reid] techniques of interviewing. You'll see the evidence that whether intentionally done or not these techniques produce unreliable, inaccurate and untrue statements.

(*Id.* at 357.)

[8] C.P. testified that when she was approximately eleven years old, she lay down with Malloch in a twin bed after watching a scary movie and fell asleep. She "woke up with his hand in [her] underwear and his finger in [her] vagina." (*Id.* at 374.) "[C.P.] looked at him and his eyes were shut and then [C.P.] removed his hand from [her] underwear." (*Id.* at 375.) C.P. then left the twin bed and slept the rest of the night next to her brother in her brother's bed.

[9]     Detective Lauer testified that he employed the Reid Technique in interrogating Malloch.  The State played videos of Detective Lauer's interrogations of Malloch for the jury, and Attorney Bohdan questioned Detective Lauer about his interrogations of Malloch.  During this questioning, Detective Lauer admitted he challenged Malloch's statements that he did not remember inserting his finger into C.P.'s vagina or that he was asleep when it occurred, but Detective Lauer did not challenge Malloch's statements when Malloch stated he was awake.  Attorney Bohdan also questioned Detective Lauer about discrepancies between what C.P. said happened and Malloch's confession.  In addition, Attorney Bohdan asked Detective Lauer about his training in the Reid Technique, and Detective Lauer explained: "To be honest, I don't think in the class we spent a whole lot of time on false confessions." (*Id*. at 492.)  Detective Lauer also testified that his understanding was that "false confessions are typically . . . done by people who are mentally ill or a very low IQ[.]" (*Id*.)

[10]    Malloch testified that he generally slept in the same bed as his wife, Anita Malloch.  He explained:

> [Attorney Bohdan:] Specifically as to what you would have personal knowledge, not what somebody else may have told you, uh, what do you know about your own practice or habits when it comes to touching your wife?
>
> [Malloch:]  I have woken up, uh, you know, again, I was messing around with her vagina, uh, and when I would wake up to that I [sic] would usually lead to intercourse or, um, and go back to sleep.

(D.A. Tr. Vol. III at 550.)

With respect to the incident in which Malloch's finger penetrated C.P.'s vagina, Malloch testified:

> Um, I recall waking up and my recollection is, uh, waking up and my hand was, realizing that it was [C.P.] that I was next to, my hand was down her pants and my finger was touching her female sex area. Uh, and pulling my hand out and I remember getting kicked out of bed.

(*Id*. at 553.) Malloch denied intentionally touching C.P.'s vagina. Malloch stated that when he tried to explain to Detective Laurer that he was asleep when he touched C.P., Detective Laurer did not believe him, and he described the interrogation as "very emotionally draining and physically draining[.]" (*Id*. at 563.) Malloch testified that he was "in shock" after being arrested and felt "[h]umiliated." (*Id*. at 567.) Malloch further explained:

> [Attorney Bohdan:] Why did you ask to speak to [Detective Lauer] again?
>
> [Malloch:] Cause I didn't want to be, I didn't want to be classified as this one percenter. I didn't want, uh, I felt in order to not be this one percenter, to because he wasn't going to write in a report that I was this good guy that, uh, made a mistake and give that to the Prosecutor instead he'd write that I denied everything and he's this bad guy, um, I wanted my report to be favorable.

(*Id*. at 572-73.) Malloch testified that he believed he suffered from sexsomnia.

[12] Anita Malloch stated that Malloch "will fondle [her] vagina or [her] vaginal area in the night while we are asleep." (*Id*. at 636.) Anita Malloch testified that she initially told Detective Lauer she was not sure she believed Malloch's claim that he was asleep when he fingered C.P. because she "was convinced that day by [her] counselor that it cannot happen in your sleep and that [she] should be concerned for [her] boys." (*Id*. at 674.)

[13] The jury returned a guilty verdict, and the trial court held Malloch's sentencing hearing on November 28, 2011. The trial court sentenced Malloch to a term of thirty years. The trial court ordered Malloch to serve twenty-eight years in the Indiana Department of Correction, and the trial court suspended the remaining two years of his sentence to probation.

[14] Malloch appealed his conviction and raised five issues in his direct appeal:

> I. Whether the trial court abused its discretion by denying Malloch's motion for a continuance made three days before trial.
>
> II. Whether the trial court erred by admitting Malloch's statements in two videorecorded interviews, in which he ultimately confessed to the crime.
>
> III. Whether it was fundamental error for the trial court to allow without admonishment the interrogating detective's repeated assertions during the videorecorded interviews that Malloch was guilty.
>
> IV. Whether the trial court erred by admitting Malloch's apology letter to his stepdaughter.

V. Whether the State committed prosecutorial misconduct amounting to fundamental error.

*Malloch*, 980 N.E.2d at 892. We held the trial court did not abuse its discretion in denying Malloch's motion to continue the trial because there was no evidence Dr. Kaplish "was ever properly subpoenaed" and Dr. Kaplish "would not commit to appearing at trial." *Id*. at 898. We also noted the crime had occurred seven years before the scheduled trial date and the trial court could not easily reschedule the trial due to court congestion. *Id*. We further held Detective Lauer properly advised Malloch of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), prior to interrogating him and Malloch did not make an unambiguous and unequivocal invocation of his right for counsel. *Malloch*, 980 N.E.2d at 900-01. We concluded Malloch's statements were voluntary under both the federal and state constitutions. *Id*. at 903. Likewise, we held the trial court did not err in admitting the apology letter Malloch wrote to C.P. *Id*. at 905. Lastly, we held two improper statements made by the State during its closing argument did not constitute fundamental error. *Id*. at 911.

[15] On January 31, 2014, Malloch filed a petition for post-conviction relief and he filed an amended petition for post-conviction relief on April 18, 2019. Malloch alleged he received ineffective assistance of trial counsel because his attorney "failed to investigate the personal and psychological characteristics that made Mr. Malloch more vulnerable than other individuals to having given a false confession," (App. Vol. II at 56), and "failed to hire or procure an expert able to

educate the jury regarding the sleep disorder that was Mr. Malloch's principle defense, particularly as that disorder related to Mr. Malloch's interrogation."[3] (*Id.* at 58.)

[16] The post-conviction court held a bifurcated evidentiary hearing regarding Malloch's petition on June 21, 2021, and January 28, 2022. Malloch called Dr. Michael Cramer Bornemann as an expert witness at the evidentiary hearing. Dr. Bornemann, a physician and former assistant professor of neurology and internal medicine at the University of Minnesota, explained that parasomnias are "the unwanted and inappropriate . . . experiences or behaviors that arise from the platform of sleep." (Tr. Vol. II at 11.) Common parasomnias include nightmares, sleepwalking, and sleep talking, but they "can also involve a complex set of behaviors that can have clinical or . . . forensic complications." (*Id.*) Parasomnias result from "electrical switching errors" in the brain. (*Id.* at 25.) A parasomnia is "essentially, a neurologic condition and not a psychiatric condition as Freud might lead us to believe." (*Id.* at 14.) Dr. Bornemann testified that sexsomnia or "sleep related abnormal sexual behavior" is an internationally recognized parasomnia. (*Id.* at 30.) He explained that "stress and anxiety" and "sleep deprivation" make sexsomnia more likely, (*id.* at 32), and an experienced health care provider is necessary to properly diagnose the

---

[3] Malloch also asserted in his petition that his trial counsel was ineffective because he did not object to statements made by the prosecutor during the State's closing argument and that Malloch was entitled to post-conviction relief because several jurors lied during voir dire. However, Malloch does not challenge on appeal the post-conviction court's rulings against Malloch on these claims.

condition. Dr. Bornemann also testified on cross-examination by the State that he would be "concerned" if someone claiming to have suffered from sexsomnia had admitted to previously touching an underage girl's bare breast. (*Id*. at 44.)

[17] Dr. Deborah Davis, a psychology professor at the University of Nevada and faculty member at the National Judicial College, also testified at the evidentiary hearing regarding her research into the psychology behind false confessions. Dr. Davis explained DNA evidence has exonerated many individuals who gave false confessions and, more than once, multiple individuals confessed to a crime that only one person committed. She described how certain interrogation tactics lead to false confessions. She explained that an individual might falsely confess because of feelings of stress and a need to escape. In addition, someone might make a false confession if the interrogator convinces the person that confession is in the person's best interest or if the person is overly deferential toward authority figures. Dr. Davis explained that the Reid Technique was at one time the most popular interrogation technique used by law enforcement, but that psychologists began heavily criticizing the method in the 1990s. Dr. Davis explained that while the characteristics of youth, low intelligence, and mental illness may make an individual more vulnerable to giving a false confession, even people with "IQ's [sic] higher than Einstein" have been proven to have falsely confessed. (*Id*. at 133.)

[18] Dr. Davis opined that Detective Lauer intended to make Malloch feel hopeless by characterizing Malloch's claim to have been asleep as "ridiculous" and saying "nobody's gonna (sic) believe it." (*Id*. at 89) (parenthetical in original).

Dr. Davis noted that Detective Lauer presented Malloch with two options and that each option assumed Malloch was guilty – "Steve the nice guy who made a mistake" versus "Steve the one percenter (1%) molester who doesn't care about anybody and, you know, uh, [is] basically an evil person." (*Id.* at 90.) Dr. Davis also discussed how an interrogator employing the Reid Technique will try to give a suspect "the illusion that this is a negotiation between the suspect and the interrogator that's gonna (sic) determine his fate." (*Id.* at 92-93) (parenthetical in original). Dr. Davis pointed out that Detective Lauer suggested throughout the interrogation that he believed "Mr. Malloch is a nice guy who made a mistake. Um, but he also refers to the threat part . . . you know if you're not gonna (sic) tell me the truth and just keep telling me this ridiculous story, I'm just outta (sic) here[.]" (*Id.* at 99-100) (parentheticals in original).

[19] Attorney Bohdan also testified during the evidentiary hearing. He explained that he consulted with two experts regarding Malloch's confession. Gerald Ofshe, a person "widely recognized as a coerced confession . . . expert," did not produce a written opinion, but Attorney Bohdan "used some of the information that he gave . . . as it related to responding to the confession issues in the case." (*Id.* at 153.) After the first trial ended in a hung jury, Attorney Bohdan attempted to get Dr. Kaplish to testify at the second trial, but the trial court refused Attorney Bohdan's motion to continue and, ultimately, Attorney Bohdan did not call any expert to testify during the second trial. Attorney Bohdan testified:

[Malloch:]  Um, did you believe, um, that having [an expert] would have been in Mr. Malloch's best interest?

[Attorney Bohdan:]  Well, if you're referring to Dr. Kaplish, um, I don't believe it would have harmed Mr. Malloch's case, um, I can only speculate as to how much it would have assisted us. That particular witness was-I would characterize as a hybrid, uh, fact expert witness.  Um, he certainly has expertise in the administration of sleep studies, um, but in terms of the, the ultimate issue as to a diagnosis of parasomnia and sexsomnia, which was, uh, the core argument in our defense, I don't think he was gonna (sic) be able to deliver that to us.  But, but he could assist in getting the ball closer to the goal.

(*Id*. at 155-56) (parenthetical in original).  Attorney Bohdan also characterized Dr. Kaplish as "not terribly cooperative."  (*Id*. at 156.)

[20]     In addition, Attorney Bohdan consulted with Dr. Bornemann, but Attorney Bohdan decided not to call him to testify.  Regarding Dr. Bornemann, Attorney Bohdan explained:

Um, there was- Mr. Malloch and I had enthusiasm for this witness, uh, I would credit Steve with finding this gentleman. Um, Steve was very involved in, uh, his defense and as I understood it, he had actually located this gentleman, uh, had communicated with him, um, and a [sic] preliminary indicators, um, were good for us.  Um, this doctor was aware of the results of the sleep study, uh, which were supportive of a parasomnia diagnosis.  Uh, this doctor was provided, uh, by my office, at his request, with copies of discovery materials, particularly, uh, the interviews that were conducted by local law enforcement of Mr. Malloch.  Subsequent to his review of those, uh, records, um, I had at least one (1) communication with him by phone and he was indicating during that call, that he wasn't gonna (sic) be able

to assist us given the nature of the statements in these interviews. I told him that our contention was that-uh, particularly the, what I'll call the third interview, uh, which was the most damaging interview, uh, that that was – our contention was that was a coerced confession. That we were working, uh, to suppress that, um, that particular statement, uh, was deemed problematic for him to, to support us with an opinion. And that pretty much colored my thinking in terms of the ability or inability to use him as an expert witness in our case.

(*Id.* at 156-57.) Attorney Bohdan did not consult with Dr. Davis about false confessions prior to either of Malloch's trials. Attorney Bohdan testified that he had never used a false confession expert in trying approximately 250 criminal cases over the course of his career. On August 8, 2022, the post-conviction court issued an order with findings of fact and conclusions of law denying Malloch's petition for post-conviction relief because Malloch had not received ineffective assistance from Attorney Bohdan.

# Discussion and Decision

[21] Our standard of review following the denial of a petition for post-conviction relief is well-settled:

> A post-conviction petition is not a substitute for an appeal, nor does it afford a petitioner a super appeal. Post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. As post-conviction proceedings are civil in nature, the petitioner must prove his grounds for relief by a preponderance of the evidence. A party appealing a post-conviction judgment must establish that the evidence is without conflict and, as a

whole, unmistakably and unerringly points to a conclusion contrary to that reached by the post-conviction court. Where, as here, the post-conviction court makes findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6), we do not defer to the court's legal conclusions, but the findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.

*Johnson v. State*, 103 N.E.3d 704, 706-07 (Ind. Ct. App. 2018) (internal quotation marks and citations omitted), *trans. denied*.

[22] The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, a defendant is entitled "to have the assistance of counsel for his defense." U.S. Const., Am. VI. This constitutional protection requires counsel's assistance be effective. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984), *reh'g denied*. We presume trial counsel provided effective assistance, and the petitioner must present strong evidence to rebut that presumption. *McCullough v. State*, 973 N.E.2d 62, 74 (Ind. Ct. App. 2012), *trans. denied*. "Isolated poor strategy, inexperience, or bad tactics does not necessarily constitute ineffective assistance of counsel." *Id*. Rather, the petitioner must show both that his trial counsel's performance was deficient and that he was prejudiced by the deficiency. *Id*. at 75. "When evaluating a defendant's ineffective-assistance-of-counsel claim, we apply the well-established, two-part *Strickland* test. The defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional

norms; and (2) counsel's deficient performance prejudiced the defendant[.]" *Bobadilla v. State*, 117 N.E.3d 1272, 1280 (Ind. 2019) (internal citation omitted). "To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the proceedings below would have resulted in a different outcome." *Gibson v. State*, 133 N.E.3d 673, 682 (Ind. 2019), *reh'g denied*, *cert. denied*, 141 S. Ct. 553 (2020).

## 1. False Confession Expert

[23] Malloch asserts he was deprived of effective assistance of counsel when Attorney Bohdan failed to call an expert witness on false confessions. He notes that such expert witnesses were utilized by the defendants in both *Miller v. State*, 770 N.E.2d 763, 774 (Ind. 2002) (holding trial court committed reversible error by excluding testimony from a psychological expert on coerced confessions), and *Shelby v. State*, 986 N.E.2d 345, 369 (Ind. Ct. App. 2013) (observing "that experts may testify on the general subjects of coercive police interrogation and false or coerced confessions"). Malloch contends "most lay people are not aware that false confessions happen. They do not understand the psychology behind modern police interrogation tactics or the ways in which those tactics can produce false confessions." (Appellant's Br. at 43) (internal footnote omitted). Therefore, he asserts "the jury was likely to view Malloch's confession as extremely compelling proof of guilt. Expert testimony, regarding false confessions and the reasons they occur, was essential to Malloch's defense." (*Id*. at 44) (internal footnote omitted).

However, when we evaluate a petition for post-conviction relief, we afford trial counsel "considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review." *Bradbury v. State*, 180 N.E.3d 249, 252 (Ind. 2022), *cert. denied*, 143 S. Ct. 261 (2022). The Sixth Amendment requires reasonable competence, not a perfect trial strategy judged with the benefit of hindsight. *Id*. "A decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess[.]" *Brown v. State*, 691 N.E.2d 438, 447 (Ind. 1998). "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." *Harrington v. Richter*, 562 U.S. 86, 106, 131 S. Ct. 770, 789 (2011) (internal quotation marks omitted).

Attorney Bohdan explained in his opening statement that Malloch's defense was going to be that his confession was false. He stated: "Who would confess to a crime they did not commit? Well, the evidence in this case is going to show ladies and gentlemen, Steve Malloch did just that." (Tr. Vol. II at 351.) He argued the statements Malloch made in the second recorded interview "were not voluntary, were not valid and were not true[.]" (*Id*. at 357.) Attorney Bohdan described them as the "products of a clever interviewing technique." (*Id*.) Attorney Bohdan also used information he learned after consulting with experts on coerced confessions to frame his cross-examination of Detective Lauer. His questioning of Detective Lauer highlighted that even though Detective Lauer challenged Malloch's account when Malloch stated he was asleep when he touched C.P., Detective Lauer did not challenge Malloch's

account when Malloch said he intentionally touched C.P. Attorney Bohdan's cross-examination of Detective Lauer also emphasized that while there is no legal distinction between a "good child molester" and a "bad child molester," Detective Lauer's interrogation of Malloch implied that there was one. (*Id.* at 496.) Malloch himself testified that it was very upsetting to him when Detective Lauer accused him of being "a one percenter." (Tr. Vol. III at 564.) Malloch believed that if he did not say that he "made a mistake" and consciously touched C.P., he would be classified as a "one percenter who goes around and prays [sic] on little children." (*Id.* at 565.) Malloch believed he would benefit from not being labeled a "one percenter[.]" (*Id.*) Finally, in his closing argument, Attorney Bohdan argued Detective Lauer used manipulative interrogation tactics to illicit a false confession from Malloch.

[26] "[W]e do not second-guess strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests." *State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997), *reh'g denied*, *cert. denied*, 118 S. Ct. 1528 (1998). Attorney Bohdan placed before the jury the theory that Malloch's confession was false and the result of police pressure. He made the strategic decision to advance this theory through his cross-examination of Detective Lauer and through Malloch's own testimony rather than through proffering an expert witness. This was a reasonable tactical decision, and we hold that Attorney Bohdan did not perform deficiently in choosing not to call an expert witness on the subject of false confessions. *See*, *e.g.*, *Troutman v. State*, 730 N.E.2d 149, 154-55 (Ind. 2000) (holding trial

counsel's decision not to call a rebuttal expert witness after cross-examining the State's expert witness was a reasonable strategic decision).

## 2. Sleep Expert

[27] Second, Malloch asserts Attorney Bohdan provided ineffective assistance in failing to call an expert witness to testify about sexsomnia. He argues that a "minimally competent defense attorney would have secured the testimony of a qualified expert." (Appellant's Br. at 58.) In *Liao v. Junious*, the United States Ninth Circuit Court of Appeals held that the petitioner was entitled to federal habeas corpus relief when the petitioner's trial counsel failed to arrange for the petitioner to undergo a sleep study when the petitioner's principal defense was that he was sleepwalking at the time of the alleged criminal act. 817 F.3d 678, 695 (9th Cir. 2016). Malloch contends he likewise is entitled to post-conviction relief.

[28] An attorney may perform deficiently by failing to present necessary expert witness testimony. *See*, *e.g.*, *Carew v. State*, 817 N.E.2d 281, 288 (Ind. Ct. App. 2004) (holding appellate counsel performed deficiently by failing to challenge on appeal the trial court's exclusion of expert testimony), *trans. denied*. "Expert testimony is appropriate when it addresses issues not within the common knowledge and experience of ordinary persons and would aid the jury." *Miller*, 770 N.E.2d at 773. "When [jurors] are faced with evidence that falls outside common experience, we allow specialists to supplement the jurors' insight." *Carter v. State*, 754 N.E.2d 877, 882 (Ind. 2001), *reh'g denied*. Yet, the decision

whether to call an expert witness is still generally a strategic decision that we will not second guess. *Curtis v. State*, 905 N.E.2d 410, 415 (Ind. Ct. App. 2009), *trans. denied*. We "will not declare counsel ineffective for failure to call a particular witness absent a clear showing of prejudice." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 108 (Ind. 2000), *cert. denied*, 122 S. Ct. 73 (2001).

[29]   Attorney Bohdan consulted with two sleep specialists – Dr. Bornemann and Dr. Kaplish – before Malloch's second trial. Attorney Bohdan explained during the evidentiary hearing on Malloch's petition for post-conviction relief that he decided not to call Dr. Bornemann as a witness because Dr. Bornemann indicated he could not be of assistance to Malloch in light of Malloch's confession during the second recorded interrogation. Attorney Bohdan explained those statements were "deemed problematic for [Dr. Bornemann] to, to support [Malloch] with an opinion." (Tr. Vol. II at 157.) Because Attorney Bohdan consulted with Dr. Bornemann and Dr. Bornemann indicated he could not provide a supportive opinion, we cannot say Attorney Bohdan performed deficiently by not calling Dr. Bornemann to testify at Malloch's trial. *See*, *e.g.*, *Reeves v. State*, 174 N.E.3d 1134, 1142 (Ind. Ct. App. 2021) (holding trial counsel made reasonable strategic decision not to call an unfavorable witness), *trans. denied*.

[30]   Unlike with Dr. Bornemann, Attorney Bohdan attempted to secure Dr. Kaplish's testimony for Malloch's second trial, but he failed to properly subpoena him. *Malloch*, 980 N.E.2d at 897. When denying Attorney Bohdan's motion to continue Malloch's trial, the trial court even noted that it was

"troubled" by Attorney Bohdan's failure to properly subpoena Dr. Kaplish. (D.A. Tr. Vol. I at 210.) Given that attempting to secure Dr. Kaplish's testimony was the only strategic change between Malloch's first trial and his second trial and that Attorney Bohdan recognized the need to secure Dr. Kaplish's testimony soon after the end of the first trial, Attorney Bohdan should have immediately begun the process of attempting to either secure Dr. Kaplish's testimony by subpoena or arranging an evidentiary deposition of Dr. Kaplish. Ultimately, neither of those two things happened.

[31] However, we cannot say Attorney Bohdan's unsuccessful effort to secure Dr. Kaplish's testimony amounted to constitutionally deficient performance. During the hearing on the motion to continue Malloch's second trial, Attorney Bohdan acknowledged he had not started the process of attempting to properly subpoena Dr. Kaplish as an out-of-state witness,[4] but he had been in frequent contact with Dr. Kaplish regarding Dr. Kaplish's availability. At the post-conviction relief hearing, Attorney Bohdan described Dr. Kaplish as a "not terribly cooperative" witness. (Tr. Vol. II at 156.) "Competence does not require an attorney to browbeat a reluctant witness into testifying[.]" *Knowles v. Mirzayance*, 556 U.S. 111, 125, 129 S. Ct. 1411, 1421 (2009) (holding petitioner failed to establish his trial counsel performed deficiently in advising him to withdraw his insanity plea after petitioner's parents refused to testify).

---

[4] *See, e.g.*, Ind. Code § 35-37-5-5 (2004) (statute concerning summoning of witnesses from another state to testify in this state).

[32] Further, putting a reluctant witness on the stand runs the risk that the witness will give unfavorable testimony. *See*, *e.g.*, *Guertin v. State*, 533 S.E.2d 159, 161 (Ga. Ct. App. 2000) (holding post-conviction relief petitioner's trial counsel was not ineffective for choosing not to call a witness to testify because "as a reluctant witness, any beneficial testimony that [she] could have provided might have been offset with testimony that could hurt [defendant's] case"). Dr. Kaplish would have been able to offer general information to the jury about sexsomnia, and as a credentialed expert, his testimony that the scientific community recognized sexsomnia likely would have carried more weight than Malloch's testimony about the condition. However, Dr. Kaplish also likely would have testified that a child molester attempting to avoid conviction might falsely assert he suffered from sexsomnia, and in diagnosing Malloch with sexsomnia, Dr. Kaplish assumed Malloch and his wife were telling the truth. In his deposition, Dr. Kaplish testified:

> [State:] But you can make a diagnosis strictly about what your patient and their families tell you?
>
> [Dr. Kaplish:] Yes.
>
> [State:] If those—if that patient or their families are lying to you, would you agree that your diagnosis could be incorrect?
>
> [Dr. Kaplish:] Could be.

(D.A. State's Ex. 1 at 20-21.) Dr. Kaplish further testified:

[State:] Did you determine that [Malloch] suffered from sexsomnia?

[Dr. Kaplish:] Yes.

[State:] Okay. What did you rely upon to make that determination?

[Dr. Kaplish:] I relied on the behavior as something that is necessarily sexual activity occurring out of sleep.

[State:] Which behavior?

[Dr. Kaplish:] The sexual behavior.

[State:] There's a lot. Describe which behavior.

[Dr. Kaplish:] I'd say the complex behavior in which he was fondling his stepdaughter.

[State:] Okay. Well, you know some people molest children intentionally and they're not asleep. So, what told you that he was asleep then?

[Dr. Kaplish:] His - - I don't know.

* * * * *

[State:] But you can understand how somebody charged with molesting a child at night, in bed together, might claim to be suffering from sexsomnia. Correct?

[Dr. Kaplish:] Yes.

[State:] And it might be false?

[Dr. Kaplish:] May be.

[State:] Okay. So, why is it you think we should believe him when he says he was asleep?

[Dr. Kaplish:] I don't know if I'm qualified to answer that question.

(*Id.* at 28-29.)

[33] When the State confronted Dr. Kaplish with details from Malloch's confession, Dr. Kaplish did not steadfastly hold to his sexsomnia diagnosis. The State asked:

[State:] If you read a statement by your patient where he admitted that he woke up, looked at his 11-year-old stepdaughter, and thought he could stick his hands down there and she wouldn't notice it because she was asleep. Would that change your diagnosis?

[Dr. Kaplish:] I don't know.

[State:] If your patient had admitted that he was sexually attracted to his stepdaughter for the two years before that, from the time she was 8 or 9 until she was 11, would that change your diagnosis?

[Dr. Kaplish:] I don't know.

[State:] If the patient admitted that he pretended to be asleep after she pulled his hand out of her vagina, would that change your diagnosis?

[Dr. Kaplish:]  I don't know.

(*Id*. at 35-36.)  Just as Dr. Bornemann testified at the post-conviction relief hearing that it would concern him if someone claiming to have sexsomnia admitted to intentionally sexually touching an underage girl, Dr. Kaplish likely would have testified that Malloch's confession to waking up and intentionally inserting his finger into C.P.'s vagina cut against a sexsomnia diagnosis.  Thus, given Dr. Kaplish's reluctance to testify and the limited value of his testimony, we hold Attorney Bohdan did not perform deficiently in not calling Dr. Kaplish to testify at Malloch's trial.  *See*, *e.g.*, *White v. State*, 25 N.E.3d 107, 134-35 (Ind. Ct. App. 2014) (holding trial counsel did not perform deficiently in choosing not to call witnesses who likely would have provided unfavorable testimony), *reh'g denied*, *trans. denied*, *cert. denied*, 136 S. Ct. 595 (2015).

# Conclusion

[34]   Attorney Bohdan did not perform deficiently by not calling an expert witness about false confessions at Malloch's trial because Attorney Bohdan pursued other strategies calculated to sow doubt regarding the veracity of Malloch's confession.  Nor did Attorney Bohdan perform deficiently when he did not call

a sleep expert who could not provide an opinion supportive of Malloch or a sleep expert who would have been a reluctant and equivocal witness at best. We accordingly affirm the post-conviction court's denial of Malloch's petition for post-conviction relief.

[35] Affirmed.

Altice, C.J., and Bradford, J., concur.